**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

CHARLIE J. McCLENDON,  :   PRISONER
  Petitioner,    :  CASE NO. 3:01CV1490(JBA)
          :
v.          :
          :
STATE OF CONNECTICUT, ET AL., :  AUGUST 13, 2007
  Respondents.    :

**MEMORANDUM OF LAW IN OPPOSITION TO THE**
**APPLICATION FOR WRIT OF HABEAS CORPUS**

   This memorandum is submitted in opposition to the application for writ of habeas

corpus filed in the above-captioned proceeding.  The petitioner raises five claims:

   1.) Connecticut courts improperly denied the petitioner's motion to suppress
   identification evidence;

   2.) Connecticut courts improperly concluded that the suppression of an
   exculpatory police report during the petitioner's probable cause hearing did
   not entitle him to a new hearing and trial;

   3.) Connecticut courts improperly refused to allow the petitioner to introduce
   the exculpatory police report under the residual exception to the hearsay
   rule;

   4.) The petitioner was denied the effective assistance of counsel guaranteed
   by the Sixth and Fourteenth Amendments to the U.S. Constitution; and

   5.) The state habeas court abused its discretion in determining that petitioner
   received effective assistance of counsel and in refusing to allow petitioner to
   appeal its dismissal of petitioner's writ of habeas corpus.

I.    **PROCEDURAL HISTORY**[1]

**A.  State Court Proceedings**

After a jury trial, the petitioner was convicted of two counts of felony murder in violation of Connecticut General Statutes § 53a-54c, two counts of robbery in the first degree in violation of General Statutes §§ 53a-134(a)(1), (2) and (4), and of an attempt to commit robbery in the first degree in violation of General Statutes §§ 53a-49(a)(2) and 53a-134(a)(2) and (4).  The petitioner was sentenced to a total term of one hundred forty years imprisonment.

The petitioner appealed.  On July 15, 1997, the Connecticut Appellate Court affirmed the judgment of conviction.  State v. McClendon, 45 Conn. App. 658, 697 A.2d 1143 (1997).  The petitioner then sought discretionary review by the Connecticut Supreme Court.  The Supreme Court granted review, but limited such review to three questions:

1.    Did the Appellate Court properly conclude that, under the circumstances of this case, the trial court correctly held there was probable cause to support a warrant authorizing the seizure of the defendant for lineup and voice sample?

2.    Did the Appellate Court properly conclude that, under the circumstances of this case, the trial court did not abuse its discretion in refusing to permit the defendant from introducing a police report under the residual exception to the hearsay rule?

3.    Did the Appellate Court properly affirm the trial court's refusal to admit expert testimony on the subject of eyewitness identification and memory retention?[2]

_____

[1] The procedural history of the petitioner's case, as well as the factual findings of the state courts, are drawn from the documents annexed hereto as appendices.  See Index to Appendices.

[2] Only the first two questions certified by the Connecticut Supreme Court resurface, in substance, in the instant matter; this last question, while initially raised in the instant (continued...)

2

State v. McClendon, 243 Conn. 943, 704 A.2d 799 (1997).

On May 11, 1999, the Connecticut Supreme Court held that probable cause supported the warrant authorizing the defendant's participation in a police lineup and the procurement of a voice sample, that the police report was not admissible under the residual exception to the hearsay rule, and that expert testimony on reliability of eyewitness identification was inadmissible. State v. McClendon, 248 Conn. 572, 730 A.2d 1107 (1999).

Earlier, on July 10, 1995, while petitioner's direct appeal to the Connecticut Appellate Court was pending, the petitioner sought collateral review. Following trial on the merits, the state habeas court denied the petition, and also denied the petitioner's petition for certification to appeal to the Connecticut Appellate Court.[3]

On review, the Connecticut Appellate Court concluded that the state habeas court did not abuse its discretion in denying petitioner's petition for a writ of habeas corpus or in denying his petition for certification to appeal. McClendon v. Commissioner of Correction, 58 Conn. App. 436, 755 A.2d 238 (2000). On October 2, 2000, the Connecticut Supreme Court denied petitioner's petition for certification for appeal from the decision of the Appellate Court. McClendon v. Commissioner of Correction, 254 Conn. 920, 759 A.2d 1025 (2000). On November 14, 2002, the petitioner filed a second state habeas petition,

---

[2](...continued)
petition, was deemed unexhausted as not fairly presented to the state courts.

[3]  In Connecticut, appeal of a habeas trial court's decision may not be taken unless said trial court grants certification to appeal. See Connecticut General Statutes § 52-470(b). The denial of such a grant is subject to review for abuse of discretion. See Copas v. Warden, 234 Conn. 139, 150, 662 A.2d 718 (1995).

as amended, which was dismissed on May 3, 2004 because the second state petition raised the same grounds as the first without asserting new facts or proffering new evidence unavailable upon the date of the earlier petition.  McClendon v. Commissioner of Correction, 2004 WL 1888857.  Nonetheless, the state habeas court granted the petitioner's petition for certification to appeal.

The petitioner appealed the decision to dismiss his second state habeas petition. The Connecticut Appellate Court held that the state habeas court properly dismissed the second petition because it was premised on the same legal grounds as the first and buttressed by no new facts.  McClendon v. Commissioner of Correction, 93 Conn. App. 228, 888 A.2d 183 (2006).  The Connecticut Supreme Court denied the petitioner's petition for certification for appeal from the Appellate Court.  McClendon v. Commissioner of Correction, 277 Conn. 917, 895 A.2d 789 (2006).

**B.  Prior Federal Proceedings**

The petitioner filed the instant petition on July 25, 2001, originally raising eight grounds for relief.  In addition to the five grounds now raised, the petitioner also claimed as additional grounds for relief:  1.) that the trial court improperly refused to admit expert witness testimony on the subject of eyewitness identification and memory retention in contravention of his right to confront witnesses and present a defense under the U.S. Constitution, 2.) that the trial court erred in admitting other crimes evidence, and 3.) that there was insufficient evidence of his identity to sustain his conviction for robbery.  On September 10, 2002, upon respondents' motion to dismiss, the Court concluded that these additional claims had not been exhausted as required by 28 U.S.C. § 2254(b)(1)(A).  In accord with Zarvela v. Artuz, 254 F.3d 374, 380-83 (2nd Cir. 2001), the Court dismissed

4

these unexhausted grounds and stayed proceedings on the remaining grounds.    The Court directed the petitioner to commence the exhaustion process, and on October 15, 2002, pursuant to the Court's directive, the petitioner filed a notice and a copy of a petition for writ of habeas corpus filed in state court indicating that he had filed a petition including the three unexhausted grounds for relief.  Such petition was never actually filed with the state court.

On April 5, 2005, the Court vacated the stay as to the exhausted grounds, without prejudice, and judgment entered on April 12, 2005.  Thereafter, the petitioner moved to reopen the case, claiming to have exhausted previously unexhausted claims, and for leave to file an amended petition for writ of habeas corpus.  His proposed amended petition did not include the three grounds previously found to be unexhausted.  Instead, petitioner set forth six grounds for relief - the five grounds he asserts in the instant petition plus the additional ground that Connecticut courts' dismissal of his second state habeas as a successive petition violated his Sixth and Fourteenth Amendment rights.  On May 30, 2006, this Court denied petitioner's motions to reopen and for leave to file an amended petition because the sixth ground for relief, as well as some factual elements underlying his claim of ineffective assistance, constituted new claims barred by the one year statute of limitations pursuant to 28 U.S.C. § 2244(d).  The Court gave the petitioner until June 30, 2006 to file new motions to reopen and amend.

### C.  The Instant Proceeding

On June 20, 2006, the petitioner again filed motions to reopen and amend.  This time, the proposed amended petition did not contain the untimely-raised new grounds for relief or the three unexhausted claims set forth in petitioner's original petition to this Court.

5

The Court granted the petitioner's motion to reopen, and the proposed amended petition was docketed.  This memorandum in opposition is directed at that petition.

## II.    FACTS UNDERLYING THE CONVICTION

The Connecticut Supreme Court adopted the following findings of fact:

At approximately 4:40 p.m. on August 11, 1987, Darlene Hale was at her desk at C & K Moving Company (C & K) at 211 Walnut Street in Hartford. A man came in and requested a job application. He was five feet six or seven inches tall and weighed between 150 and 165 pounds. He was black and had short dark hair, a moustache and a pockmarked face. He was wearing gold-rimmed tinted eyeglasses and a blue shirt with the sleeves rolled up. She handed the man an application. At that time, Dennis Shortell, the owner of C & K, asked Hale to place a telephone call. After she had placed the call, a man came up behind her, put a silver and black gun to her head and demanded money. Hale noticed that the robber had the same rolled up blue shirt sleeves and the same voice as the man to whom she had given the job application. As Hale emptied her wallet into the robber's bag, Grayland Cannon, another employee of C & K, walked in. The robber demanded money from Cannon and, when Cannon told the robber that he did not have any money, the robber shot him. The robber then went to Shortell's office, demanded money, shot Shortell and fled. Both Cannon and Shortell died from their gunshot wounds.

At approximately 4:45 p.m. that same day, from his residence in the vicinity of C & K, Hector Colon heard "three or four" gunshots and subsequently saw a black male "walking real fast ... looking backwards." The man was wearing a blue shirt with "no sleeves" and carrying a paper bag under his arm. Around that same time, also in the vicinity of C & K, Stephen Tinker observed a man wearing gold-rimmed tinted eyeglasses and a blue and white striped shirt. Shirley Lassiter also saw a man wearing a "blue short sleeve shirt" and walking fast. Both Tinker and Lassiter later identified the man they saw that day as the defendant from an array of photographs and also identified him at trial.

Within minutes of the shooting, the police arrived, and Hale gave them a description of the job applicant. When police detectives arrived at approximately 5 p.m., Hale gave an even more detailed description. Hale described the applicant as a black man, twenty to twenty-five years old, medium complexion, short cropped hair, about five and one-half feet tall, and about 150 pounds. She described him as wearing a light blue dress shirt with the sleeves rolled up and most of the buttons undone. His shirt was untucked. He had a moustache and was wearing gold-rimmed eyeglasses

with a yellow tint. Hale gave the police a sworn statement at the police station at approximately 8 p.m. that night. While Hale was at the police station, she also assisted the police in developing a composite sketch of the robber.

In the days immediately following the C & K robbery, Hale was also shown three photographic arrays. On August 12, she was shown an array of photographs of black men with eyeglasses that did not include a photograph of the defendant, and she did not make an identification. On August 14, she was shown two arrays, both of which included a photograph of the defendant. Hale could not identify any one photograph as that of the job applicant and she told the police that she needed to see the job applicant in eyeglasses in order to identify him.

On August 13, 1987, the police executed a search and seizure warrant on the defendant's residence at 18-20 Edgewood Street in Hartford. In the apartment, the police found a twenty-two caliber handgun with a silver cylinder and white plastic grips. James McDonald, a forensic firearms examiner, testified at trial that in his opinion "all three of those [bullets that killed Shortell and Cannon and injured a victim in another uncharged robbery] were fired from [the gun found in the defendant's apartment] and no other revolver."

In September, 1989, two years after the C & K robbery, the defendant was incarcerated on unrelated robbery charges. During those two years, Hale was shown, on seven or eight occasions, several arrays that included a photograph of the defendant, but she could not identify the defendant as the man in the gold-rimmed tinted eyeglasses who had asked her for the job application. In May, 1989, Hale was contacted by Detective Ronald Faggaini of the Hartford police department, who recently had taken over the investigation of the C & K robbery. Hale told him that since she had not seen the robber's face, she could not identify the robber. She also told Faggaini that she recognized the robber's arm as that of a man to whom she had given a job application minutes before the robbery. Shortly thereafter, she told a state's attorney that she might be able to recognize the robber's voice if she heard it again. The police then secured a search and seizure warrant authorizing the defendant to be placed in a lineup and to give a voice sample.

On September 15, 1989, Hale viewed a lineup composed of six black men. She also heard the men speak. From the lineup and the voice sample, Hale identified the defendant as the gunman. The defendant subsequently was charged with and found guilty of the C & K robberies and murders.

The defendant filed a pretrial motion to suppress the photographs, the tape or video recordings and any identifications of him that had been made from

the lineup. The trial court denied this motion. At trial, Hale identified the defendant as the perpetrator of the crimes. The defendant sought to introduce expert testimony from a psychologist on eyewitness identification, and the trial court excluded the testimony of the expert. The trial court also excluded a police report containing a record of Hale's conversation with Faggaini on May 18, 1989.

McClendon, 248 Conn. at 574-77 (internal quotes omitted).

## III.    ARGUMENT

Pursuant to 28 U.S.C. § 2254(d)(1),[4] a writ of habeas corpus "may issue only if one of the following two conditions is satisfied – the state court adjudication resulted in a decision that (1) 'was contrary to . . . clearly established federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established federal law, as determined by the Supreme Court of the United States.'" Williams v. Taylor, 529 U.S. 362, 412, 120 S.Ct 1495, 1523, 146 L.Ed.2d 389 (2000). Clearly established federal law is determined by the holdings, rather than the dicta, of the Supreme Court's decisions at times pertinent to state court decisions. Williams, 529 U.S. at 412, 120 S.Ct at 1523.

A state court's decision is "contrary to" clearly established federal law if it falls within one of two scenarios. Under the first scenario, a state court decision will be contrary to "clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [U.S. Supreme Court] cases." Williams, 529 U.S. at 405, 120 S.Ct at 1519. Under the second scenario, a "state court decision will also be contrary to this Court's

_____

[4]28 U.S.C. § 2254(d)(1) is part of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), which modified the role played by federal habeas courts in reviewing petitions filed by state prisoners.

clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this court and nevertheless arrives at a result different from our precedent."  Id. at 406, 1519-20.

If a state court decision is not "contrary to" U.S. Supreme Court precedent, the federal habeas court must determine whether the state court's decision involved an "unreasonable application" of clearly established federal law.  In so doing, a federal habeas court "should ask whether the state court's application of clearly established federal law was objectively reasonable.  Williams, 529 U.S. at 409, 120 S.Ct at 1521.  An "unreasonable application of federal law is different from an incorrect application of federal law."  Id. at 410, 1522.  "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411, 1522.

A court analyzing a claim under AEDPA begins "by determining the relevant clearly established law" which is "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision. . . . " Yarborough v. Alvarado, 541 U.S. 652, 660-61, 124 S.Ct. 2140, 2147, 158 L.Ed.2d 938 (2004) (internal citation omitted).  The "governing legal principles" relevant to each of the petitioner's five claims in this § 2254 proceeding, and an application thereof, follow, in turn.

**A.    Petitioners' Claim Regarding Identification Evidence Fails in this Federal Habeas Action.**

The petitioner claims that Connecticut courts erred in denying his motion to suppress identification evidence.  Specifically, he claims that, 1.) there was no probable cause to issue a search and seizure warrant compelling his placement in a police lineup and providing his voice sample, and 2.)  the police lineup was unnecessarily suggestive, resulting in an unreliable identification.

The Connecticut Appellate Court analyzed the petitioner's warrant claim under Article First, § 9 of the Connecticut Constitution and determined that the warrant was supported by probable cause.  The court explained that probable cause was established by (1) Darlene Hale's detailed description of the assailant and (2) the corroborating identification, through the composite drawing, made by another witness.  Probable cause was not extinguished by the fact that Hale was unable to identify the killer when he was not wearing eyeglasses and without hearing his voice.  McClendon, 45 Conn. App. at 665. The Connecticut Supreme Court concluded, for materially the same reasons,  that the affidavit "presented a factual basis to support the court's conclusion that probable cause for the lineup and voice sample existed."  McClendon, 248 Conn. At 580-81.

The Appellate Court also found the identification procedures reliable, stating:

We are not persuaded by the defendant's argument that the identification procedure was unnecessarily suggestive because he was the only person in the lineup whom Hale had seen before. The recurrent use of a defendant's photograph in successive arrays ... is not presumptively suggestive. Although Hale was shown photographs of the defendant in arrays on several occasions, she had never identified the defendant from those arrays. Additionally, Hale maintained that she had closely observed the defendant when he requested an employment application and heard him speak several times. She could not, however, identify him without seeing a lineup composed of persons wearing glasses and without hearing his voice. The

10

trial court, therefore, could reasonably conclude that the identification procedure was not unnecessarily suggestive.

The defendant next contends that, even if the procedure was not unnecessarily suggestive, the identification was unreliable under the totality of circumstances. The constitutional test for reliability requires the trial court to consider the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

In this case, Hale had ample opportunity to see and to hear the robber. She had a high degree of attention and was face-to-face with the defendant, and her description of the perpetrator at the time of the incident was quite detailed. Hale also demonstrated certainty in identifying the defendant at the lineup. Furthermore, we cannot assume that the two year period between the identification and Hale's viewing of the defendant was so long as to render her identification unreliable. Under these circumstances, the trial court properly concluded that the identification procedure was not so suggestive and unreliable as to violate the defendant's right to due process.[5]

McClendon, 45 Conn. App. at 665-66 (internal quotes and citations omitted).

> **1.    Petitioner's Claims Regarding the Search and Seizure Warrant are not Cognizable in this Action and, Further, Even if Cognizable, the Warrant was Supported by Probable Cause.**

At trial, the petitioner sought to suppress as "fruits of an illegal search and seizure any photographs and/or video or audio tape recordings of [his] person along with any corporeal identifications of [him] made as a result of a lineup conducted on September 15,

---

[5] The question of whether the identification was reliable was not among those certified for review by the Connecticut Supreme Court.

11

1989."[6]   The petitioner's claim is not cognizable in this action because it was not fairly presented as a federal constitutional issue to Connecticut courts and because it is barred by the United States Supreme Court's decision in  Stone v. Powell, 428 U.S. 465, 494-95, 96 S.Ct 3037, 3052-53 (1976).  Further, even if the claim were cognizable, relief is barred by Williams, supra, insofar as the state courts' determination that the warrant was issued upon probable cause was not contrary to or an unreasonable application of clearly established federal law.

> **a.   The petitioner's Fourth Amendment "exclusionary rule" claim is not cognizable in this federal habeas matter pursuant to Stone v. Powell.**

If the petitioner's claim is brought under the Fourth Amendment rather than the Connecticut Constitution, see Section III, A.1.b. below, such claim is not cognizable pursuant to Stone v. Powell, 428 U.S. 465, 494-95, 96 S.Ct 3037, 3052-53 (1976).  Where a state prisoner has been given a full and fair opportunity to litigate a Fourth Amendment "exclusionary rule" claim in the state courts, he may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.  Id.

In Stone, a federal habeas action consolidating multiple cases, one of the petitioners claimed that he was unlawfully incarcerated because evidence used to convict him

---

[6] See copy of Motion to Suppress, dated April 23, 1990, annexed hereto as **Appendix I**.  The petitioner's claim is predicated on what is commonly referred to as the "exclusionary rule" or the "fruit of the poisonous tree doctrine," the genesis of which can be found in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182 (1920).  In short, the rule purports to deter Fourth Amendment violations through the prophylactic requirement that evidence garnered as a result of such violations be suppressed.

emanated from an illegal search of his home, the underlying warrant having been found invalid by the District Court under <u>Spinelli v. U.S.</u>, 393 U.S. 410, due to a defective supporting affidavit.  After a detailed analysis of the law surrounding both habeas corpus and the exclusionary rule, the <u>Stone</u> court reasoned that the remedial effects of the exclusionary rule, a judicially created device purporting at its core to deter prospective Fourth Amendment violations, are diminished in a habeas proceeding, often occurring years after the police investigation of an incident, and that its minimal deterrent value at such a late stage is outweighed by the costs of exclusion.  <u>Stone</u>, 428 U.S. at 493. Accordingly, where "the exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted." <u>Arizona v. Evans</u>, 514 U.S. 1, 11, 115 S.Ct. 1185, 1191 (1995), <u>quoting</u> <u>United States  v. Janis</u>, 428 U.S. 433, 454, 96 S.Ct. 3021, 3032 (1976); <u>see</u> also <u>Pennsylvania Board of Probation and Parole v. Scott</u>, 534 U.S. 357, 362-64, 118 S.Ct. 2014, 2019-20 (1998) (declining to extend the exclusionary rule beyond the criminal trial context where the cost of doing so outweighs the deterrent benefit).

The instant petitioner invokes the "exclusionary rule" in its purest sense as a deterrent against law enforcement missteps. Assuming, <u>arguendo</u>, that the search warrant were invalid, the petitioner does not complain - and, indeed, would not be reasonable in complaining - that his trial would have been fundamentally different if he participated in the lineup only after the procurement of a valid warrant.  Instead, the petitioner complains that he should be entitled to benefit from the exclusionary rule merely because there <u>is</u> an exclusionary rule, irrespective of the rule's underlying purpose; he does not claim its employment would cure some fundamental flaw in the process of his trial and conviction.

It is in this very sense of the exclusionary rule that the Stone court found too much attenuation for the rule to have utility in federal habeas cases.

In sum, the petitioner fully and fairly litigated the issue of excluding the results of the compelled line-up in state courts. Although he disagrees with those results, he is not entitled to contravene Stone by banishing evidence pursuant to the exclusionary rule's prophylactic purpose. Accordingly, his claim is not cognizable in this proceeding.

> **b.    The petitioner did not exhaust his claim through fair presentment to the state courts and therefore relief is not available in this action.**

Federal habeas corpus relief "shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the state. . . ." 28 U.S.C. § 2254(b)(1)(A). This "exhaustion requirement springs primarily from considerations of comity." Daye v. Attorney General, 696 F.2d 186, 191 (2nd Cir. 1982). It requires that federal courts refrain from exercising "habeas review of a state conviction unless the state courts have had an opportunity to consider and correct any violation of federal law" and, thus, demonstrates "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." Id.

Exhaustion in this context means more than just proceeding through the state courts; it requires fair presentment to the state courts so that they have an opportunity to correct alleged constitutional violations. Ellman v. Davis, 42 F.3d 144, 147 (2nd Cir. 1994). As the U.S. Supreme Court has explained, "to protect the integrity of the federal exhaustion rule, we ask not only whether a prisoner has exhausted his state remedies, but also whether he has properly exhausted those remedies, i.e., whether he has fairly presented

14

his claims to the state courts . . . ." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 848, 119 S.Ct.

1728, 1734, 144 L.Ed.2d 1 (1999) (emphasis in original).    "[T]he ways in which a state

[petitioner] may fairly present to the state courts the constitutional nature of his claim, even

without citing chapter and verse of the Constitution, include (a) reliance on pertinent federal

cases employing constitutional analysis, (b) reliance on state cases employing

constitutional analysis in like fact situations, (c) assertion of the claim in terms so particular

as to call to mind a specific right protected by the constitution, and (d) allegation of a

pattern of facts that is well within the mainstream of constitutional litigation." <u>Daye</u>, 696

F.2d at 191.  Nonetheless,

> [t]he exhaustion doctrine requires a habeas applicant to do more than scatter
> some makeshift needles in the haystack of the state court record.  The
> ground relied upon must be presented face-up and squarely; the federal
> question must be plainly defined.  Oblique references which hint that a theory
> may be lurking in the woodwork will not turn the trick.

<u>Martens v. Shannon</u>, 836 F.2d 715, 717 (1st Cir. 1988), <u>citing</u> <u>Anderson v. Harless</u>, 459

U.S. 4, 6, 103 S.Ct. 276, 277 (1982) (per curiam); <u>see, also</u>, <u>Chambers v. McCaughtry</u>, 264

F.3d 732, 738 (7th Cir. 2001) ("mere 'passing reference' to a constitutional issue certainly

does not suffice."), <u>citing</u> <u>Fortini v. Murphy</u>, 257 F.3d 39, 44 (1st Cir. 2001).

In the instant case, the petitioner's claim that the warrant was issued without

probable cause pursuant to the U.S. Constitution was never tendered in an appropriate

fashion to the state courts. The Connecticut Appellate and Supreme Courts analyzed the

petitioner's claim under the Connecticut constitution, because the petitioner's claim on

appeal rested, in substance, entirely on the Connecticut constitution.[7]  In his Petition for

Certification to Appeal to the Connecticut Supreme Court, the petitioner signals that his

warrant claim relies exclusively on two state cases, State v. Duntz, 223 Conn. 207 (1992),

and State v. Schifflett, 199 Conn. 718 (1986).[8]   In his brief to the Connecticut Supreme

Court, the petitioner made only peripheral, "passing" references to federal constitutional

provisions by way of a footnote explaining that the motion to suppress was advanced at

trial under both the U.S. and Connecticut constitutions.[9] The substance of his entire

analysis in his Connecticut Supreme Court brief, however, is based upon Article First, § 9

of the Connecticut Constitution.  See **Appendix Q** at 7-12.  Accordingly, the claim that the

petitioner now makes pursuant to the Fourth, Fifth and Sixth Amendments to the U.S.

Constitution was not fairly presented to the highest state court, and it has not, therefore,

been exhausted within the meaning of 28 U.S.C. § 2254(b)(1)(A).

---

[7] "The [petitioner] argues that the warrant authorizing the lineup and voice sample violates article first, § 9 of the Connecticut constitution."  McClendon, 45 Conn. App. at 662, and McClendon, 248 Conn. at 578.

[8] See Petition for Certification to Appeal (**Appendix P**) at 5-6.

[9] See Petitioner's Brief on Certification to the Connecticut Supreme Court (**Appendix Q**) at 7-12.  Courts in Connecticut have considered issues raised in footnotes insufficiently raised.  See, e.g., Sweeney v. AFSCME, 2001 WL 1266283 (Conn. Super.) at *3 ("Furthermore, the issue was not properly briefed, merely raised in a footnote.").

16

c.    **Alternatively, the state courts' determination that there was sufficient probable cause to issue the search warrant was not contrary to, or an unreasonable application of clearly established federal law.**

Even if the petitioner's claim were cognizable in this proceeding and were exhausted, it must fail on the merits because the state courts' probable cause determination neither contravened nor unreasonably applied clearly established federal law.  Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317 (1983), and its progeny establish the governing principles in controversies surrounding whether a warrant application contains sufficient facts to establish probable cause to issue the warrant.  Although earlier cases such as Aguilar v. Texas, 378 U.S. 108, 845 S.Ct. 1509 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584 (1969), had established a somewhat rigid approach to determining whether a warrant was supported by probable cause, Gates set forth a more fluid "totality of the circumstances" test.  As the Court there said:

> [P]robable cause is a fluid concept - turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully, reduced to a neat set of legal rules.

Gates, 462 U.S. at 232

The warrant affidavit in Gates was based on an informant's tip, in the form of an anonymous letter to police, indicating that certain persons were engaged in the selling of drugs.  The letter set forth an itinerary for an anticipated drug exchange, and stated that the Gates petitioners possessed a substantial amount of drugs within their residence. When police surveillance lent corroboration to the itinerary laid out in the anonymous letter, the police sought, and a judge issued a warrant authorizing search of the residence.

17

Recognizing that "finely tuned standards" cannot be applied to the decision to issue a warrant, Id. at 235, and that such decisions are to be afforded great deference, the Gates Court went on to state that when, in issuing a warrant, the judge or magistrate has made a practical "common-sense decision" given all of the facts and circumstances set forth in an affidavit, "including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information," he has a "substantial basis" for his decision, and it should not be invalidated. Id. at 238-39. The Court found that the corroboration of the anonymous informant's predictions was "of significant value," and concluded that all of the attendant circumstances justified issuance of the warrant. In other words, the Court abandoned earlier precedent and adopted a "totality of the circumstances" standard.

The affidavit at issue here (**Appendix J**) related (1) that the chief witness to the incident underlying this matter, Darlene Hale ("Hale"), observed a black male who entered her place of employment and asked her for an employment application, which she provided, (2) that minutes later a black male approached her from behind, produced a black and silver "flat" handgun from his trousers, placed the gun beside her head and demanded money, (3) that Hale provided a detailed description of the black male, including his clothing,[10] (4) that she assisted in the preparation of a composite drawing of the black male, (5) that the composite was shown to a witness to another, recent robbery,

_____

[10]The affidavit related Hale's description of the black male as follows: "approximately twenty-five years old, 5'6" in height, 150-160 pounds in build, being medium complected, having short-cropped hair. His face appeared to be pock-marked or had a razor burn. He wore gold rimmed eyeglasses with the lenses having a brownish-yellow tint . . . wore a light blue dress shirt, sleeves rolled up, shirt being unbuttoned and not tucked inside his trousers (possibly blue-jeans), sneakers, and possibly wore a black hat that had a short brim. The black male also had a moustache."

who stated that the drawing resembled the perpetrator there, (6) that the gun used in the prior robbery also matched Hale's description, (7) that yet another witness to the earlier robbery positively identified the petitioner from a photograph array as the perpetrator, (8) that two days after the incident underlying this matter another robbery occurred at a real estate office and that the petitioner was again positively identified as the perpetrator of that later crime, and (9) that although Hale had been unable to positively identify the perpetrator in this incident, she believed she might be able to identify him if she heard his voice, and that she would voluntarily view a lineup in order to attempt an identification.

In accord with Gates, the Connecticut Supreme Court, viewing the information available to the issuing judge in the light most favorable to his determination, found that Hale's detailed description, the composite sketch, corroborative identifications by witnesses to the other robberies and Hale's ability to identify the perpetrator if he wore eyeglasses and if she heard his voice, established probable cause. McClendon, 248 Conn. at 580. Clearly, each witness to the various crimes, motivated to assist the police in apprehending the perpetrator, was veracious and possessed a basis of knowledge. Hale's basis of knowledge was established by her proximity to, and her detailed description of, the perpetrator. There was also some corroboration among the witnesses with respect to the description of the weapon used in the commission of the crimes. As a result, the affidavit provided a "substantial basis" to decide that there was probable cause to issue a warrant. A reasonable belief that evidence will aid in the identification of a perpetrator can support a finding of probable cause. See, e.g., Warden v. Hayden, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782 (1967). Therefore, the Gates "totality of the circumstances" test, in light of the facts presented in the affidavit, strongly militates in favor of the issuing

19

judge's determination that probable cause existed.  Clearly, the decision of the Connecticut Supreme Court that probable cause was established for the police to obtain further evidence concerning the robbery and murders was not contrary to, or an unreasonable application of, clearly established law as determined by the U.S. Supreme Court in <u>Gates</u> and cases following its precedent.  It follows, therefore, that the petitioner's claim must fail.

> **2.    The Totality of the Circumstances Surrounding Identification of the Petitioner as the Perpetrator Produced a Reliable Identification.**

The petitioner further avers that the identification procedures employed were unnecessarily suggestive, that an in-court identification was irretrievably tainted by the prior line-up identification, which he characterizes as "illegal," that the identification was therefore unreliable.  For the reasons set forth below, the decision of the state courts is not contrary to, or an unreasonable application of clearly established federal law.

> **a.    Petitioners claim fails because Connecticut courts' determination that the identification procedures were not unnecessarily suggestive neither contravenes nor unreasonable applies clearly established federal law.**

On direct appeal to the Connecticut Appellate Court, the petitioner argued, as he does here, that identification procedures were unnecessarily suggestive.  Specifically, he claimed that the lineup was unnecessarily suggestive because he was the only person in the lineup who Hale had seen before (in the photographic arrays she had been shown), and that the identification was unreliable under the totality of the circumstances.  <u>See</u>

McClendon, 45 Conn. App. 658.[11]  The Connecticut Appellate Court disagreed, and such decision is not unreasonable.

The Due Process Clause of the Fifth and Fourteenth Amendments forbid a lineup that is unnecessarily suggestive and conducive to irreparable mistaken identification. Kirby v. Illinois, 405 U.S. 682, 691, 92 S.Ct. 1877, 1883 (1972), citing Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967 (1967); Foster v. California, 394 U.S. 440, 89 S.Ct 1127 (1969). Whether such a violation has occurred depends upon the totality of the circumstances surrounding the identification.  Stovall, 388 U.S. at 302.  Even where identification procedures are unnecessarily suggestive, however, identification testimony deemed reliable may be properly admitted into evidence.  Manson v. Brathwaite, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253 (1977).   The corruptive effect of a suggestive identification is to be weighed against factors of reliability, including the opportunity of the witness to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation.  Id.  If, once all of these and other circumstances attendant to the identification are considered, it can be said that identification procedures yielded a "very substantial likelihood of irreparable misidentification," then a violation of constitutional dimension has occurred.  Id. at 116, quoting Simmons v. U.S., 390 U.S. 377, 384, 88 S.Ct. 967, 971 (1968).

In Simmons, on the day following a bank robbery, the FBI obtained photos of one of the suspects from a relative and showed them to each witness, all of whom identified

---

[11]The "suggestiveness" issue was not among those questions certified for review by the Connecticut Supreme Court.

Simmons as one of the robbers.  Three weeks later, three of the witnesses identified one Garrett from photographs; the other two witnesses stated that they did not have a clear view of the second robber.  Consistent identifications were made at trial, but none of the photographs were introduced.   The defendants there claimed that the in-court identifications were suggested by the pretrial introduction of their photos to the witnesses. The Court held that, under the totality of the circumstances, the identification was not constitutionally infirm.  Specifically, the Court noted that a serious felony had occurred, the perpetrators still at large, and resorting to photographic identification was therefore justified.   Id. at 384-85.  Moreover, the Court noted that there was no indication that FBI agents suggested which persons in the photos were suspects and that, even subject to cross examination, none of the witnesses displayed doubt as to their identification.  Id. Accordingly, the Court held the identification reliable even though "the identification procedure employed may have in some respects fallen short of the ideal."  Id. at 385-86.

In Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375 (1972), a federal habeas corpus case, a rape victim gave police what was characterized as a "very general description" of the offender.  In the months after, she viewed suspects in her home and at the police station in lineups, showups and photographs, but failed to identify her assailant.  Finally, the victim was called into the police station to view the petitioner in that case, who was being detained on another charge.  In a showup, the petitioner there was made to walk past the victim and utter certain words.  At that point, the victim identified that petitioner with certainty.   The Court found that the identification procedure was suggestive, but nonetheless reliable because the victim was with the perpetrator for up to one-half hour at the time of the crime, saw him under adequate lighting, faced him directly to some degree,

22

provided a "more than ordinarily thorough " description, and expressed "no doubt" as to the identity following the showup.  Id. at 200.  The Court did note that the lapse of seven months between the rape and confrontation "would be a seriously negative factor in most cases."  But, the Court found that where the victim made no previous identification at any of the showups, lineups or photographic arrays, it was apparent that "she had previously resisted whatever suggestiveness inheres in a showup," and she could therefore be deemed reliable.  Id. at 201.

Here, as in Simmons, a serious felony had occurred, the perpetrator still at large with respect to the subject crime, and, without any indication that the police suggested to Hale which person in the lineup was suspected, she selected the petitioner with certainty.

Further, Hale closely observed the petitioner when he asked for an employment application, because it was part of her job at C & K to screen applicants and determine based on their appearance whether they should be given an application.  See **Appendix S** at 397-99.  In fact, Hale testified at trial that she made such an appearance-related assessment of the petitioner.  See **Appendix S** at 403-04.  Moreover, Hale was in close proximity to him at that time and heard him speak several times but could not identify him without seeing a lineup in which the participants would wear glasses and speak.  Due to these facts, all of which are materially indistinguishable from the facts in Simmons or Biggers, the Connecticut Appellate Court found the identification reliable.

Further, the Appellate Court, citing Brathwaite, employed the "totality of the circumstances" test.  The Appellate Court analyzed that Hale's opportunity to see and to hear the perpetrator at the time of the crime, her "high degree of attention" and "face-to-

face" contact with the petitioner when he appeared for the job application, her detailed description of the perpetrator, and the certainty with which she identified the petitioner at the lineup (she stated at trial that she determined at the time of the lineup that she was "a hundred percent sure" that the petitioner perpetrated the crime at issue here.  Tr. 11/19/92 (**Appendix L**) at 193).[12]

The analysis by the Connecticut courts with respect to the "suggestiveness" of the identification procedures and the "reliability" of the identification mirrors the law clearly established by the aforementioned Supreme Court cases.  The petitioner, therefore, cannot show that the Connecticut Appellate Court's determination that, under the totality of the circumstances, the procedures were non-suggestive and the identification was reliable, is contrary to, or an unreasonable application of, clearly established federal law.  Williams v. Taylor, 529 U.S. 362.  Accordingly, petitioner's claim cannot be sustained.

### B.     The Petitioner's Claim Regarding Suppression of an Exculpatory Police Report at the Time of his Probable Cause Hearing does not Implicate Federal Law.

The petitioner next claims that a report (hereinafter, "the report") authored by Detective Ronald Faggaini[13] held exculpatory information and that it was improperly suppressed by the state at the time of his probable cause hearing in October 1989.  In his direct appeal, he raised no claim that the report was suppressed at the time of his criminal

---

[12]All references to transcripts are in the following format:
Tr. [Date] (**Appendix [letter]**) at [page number].
All referenced transcripts are annexed hereto.

[13] The Detective's name is in many places spelled "Faggiani."  The spelling adopted here is from the September 14, 1989 warrant affidavit (**Appendix J**) which Faggaini himself signed.

trial in 1992. Indeed, his attorneys referenced the report in a motion dated November 25, 1989. See **Appendix K**. Thus, the petitioner's claim only challenges the results of the 1989 hearing in probable cause, which is a hearing mandated by the state constitution. The petitioner has no right under the federal constitution to a probable cause hearing. As a result, his claim does not implicate "the Constitution or laws or treaties of the United States" and is not cognizable in these federal proceedings. 28 U.S.C. § 2254(a).

Federal courts may entertain applications for writs of habeas corpus in behalf of persons in custody pursuant to judgments of state courts only on the ground that they are in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A "state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." McCullough v. Singletary, 967 f.2d 530, 532 (11th Cir. 1992); Bronstein v. Wainwright, 646 f.2d 1048, 1050 (5th Cir. 1981). The United States Supreme Court has held "that it is not the province of a federal court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991). Indeed, the determination of state evidentiary law is binding on federal courts. Storti v. Massachusetts, 183 U.S. 138, 142, 22 S.Ct. 72, 46 L.Ed. 120 (1901).

The Constitution of the United States does not require that the states provide criminal defendants with probable cause hearings. Gerstein v. Pugh, 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975) ("[A] judicial hearing is not prerequisite to prosecution by information"); Lem Woon v. Oregon, 229 U.S. 586, 33 S.Ct. 783, 57 L.Ed. 1340 (1913). Nonetheless, in Connecticut, a defendant charged with murder is entitled to a probable cause hearing pursuant to Article First, § 8, as amended, of the Connecticut

25

Constitution.  "Article First, § 8, of the Connecticut Constitution, as amended, provides in part that '[n]o person shall be held to answer for any crime, punishable by death or life imprisonment, unless upon probable cause shown at a hearing in accordance with procedures prescribed by law.'" State v. Marra, 222 Conn. 506, 513, 610 A.2d 1113 (1992), citing State v. Boyd, 214 Conn. 132, 570 a.2d 1125 (1990).  Additionally, Connecticut General Statutes § 54-46a(a) provides, in relevant part, that no person "charged by the state . . . shall be put to plea or held to trial for any crime punishable by death or life imprisonment unless the court at a preliminary hearing determines there is probable cause to believe that the offense charged has been committed and that the accused person has committed it."  A defendant convicted of felony murder in violation of General Statutes § 53a-54c may be sentenced to a term of imprisonment "not less than twenty-five years nor more than life."  Connecticut General Statutes § 53a-35a(2).  Thus, under state law, the petitioner was entitled to a probable cause hearing.  No federal law, however, compelled such a hearing.

In the state courts, the petitioner claimed that the suppression of the report at the probable cause hearing entitled him to a new hearing.  McClendon, 45 Conn. App. At 668.  The resolution of this issue involves the interpretation of, and application of facts to, state law pertaining to the petitioner's state-created right to a hearing in probable cause.  No federal question is involved.  The Connecticut Appellate Court determined that the report was disclosed to the petitioner before his criminal trial.  Thus, there is no claim of a violation pursuant to Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), at trial.  As a result, the petitioner is not entitled to federal habeas corpus review of this claim or relief therefrom.

26

C.     **Connecticut Courts Reasonably Determined that the "Exculpatory" Police Report was not Sufficiently Reliable to be Admitted under the "Catch-All" Hearsay Exception.**

The petitioner claims that Connecticut courts erred in refusing to permit him to introduce into evidence at trial the Faggaini report under the "residual exception" to the hearsay rule.    The petitioner wanted to introduce the report because, in it, Faggaini recalled:

> Ms. Hale stated since she didn't see the culprit's face at the time of the robbery/murder, she wouldn't be able to make [an] identification.  Ms. Hale stated it was [an] assumption on her part that the black male who entered minutes before was the one responsible. . . .  Ms. Hale stated she is really unsure if she could identify the male who she gave [an] application to."

The petitioner, in the instant petition, rests his claim upon:

> The right of an accused in a crimial [sic] trial to due process, the right to a fair opportunity to defend against the state's accusation.  The right to confront and cross-exaimine [sic] witnesses and to call witnesses in ones [sic] own behalf.[14]

The petitioner further avers that the report was exculpatory, reliable and trustworthy, and undermined Hale's testimony at trial.

---

[14] While Faggaini, who was unavailable at trial as a result of his death, authored the report, the statements in the report, particularly those the petitioner claims are exculpatory, were attributed to Hale, an available "declarant" who testified at trial.    Accordingly, the petitioner's reliance on hearsay exceptions is somewhat misplaced, insofar as they are typically invoked in the case of an unavailable declarant.  Nonetheless, the Connecticut courts indulged the petitioner and engaged in detailed analyses.  To the extent petitioner is challenging the suppression of impeachment evidence against a testifying witness, he is in substance reasserting and expanding  his third claim, discussed above.

27

1.    **The Petitioner Did Not Fairly Present a Constitutional Basis for His Hearsay Exception Claim in Connecticut Courts and it has Therefore Not Been Exhausted.**

The Connecticut Appellate Court considered the petitioner's "hearsay exception"

claim solely as an evidentiary one, and not a constitutional one, stating:

> After his motion for a mistrial based on the state's withholding the Faggaini report was denied, the defendant offered the report as a full exhibit under the residual exception to the hearsay rule.  The trial court sustained the state's objection to its admission on the ground that the report was "more likely misleading than accurate" and that " there is absolutely nothing of any special trustworthiness with this undated report. . . . "
>
> An out-of-court statement is hearsay when it is offered to establish the truth of the matters contained therein.... As a general rule, hearsay evidence is not admissible unless it falls under one of several well established exceptions.... The purpose behind the hearsay rule is to effectuate the policy of requiring that testimony be given in open court, under oath, and subject to cross-examination.... The residual, or catch-all, exception to the hearsay rule allows a trial court to admit hearsay evidence not admissible under any of the established exceptions if: (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions."
>
> In this case, the defendant claims that the statement met the necessity requirement because Faggaini died before the trial and he was the sole source of the information contained in his report. The defendant also argues that the statement was reliable and trustworthy because it was an official police report filed by the lead investigator. We find these arguments to be meritless.
>
> Although Faggaini indeed could not testify about the contents of his report, Hale, the hearsay declarant, was available and testified about her statement. The statements contained in the report were also fairly consistent with Hale's testimony at trial and in the search and seizure affidavit. The hearsay statement, therefore, was not reasonably necessary.
>
> The trial court also found that the hearsay was misleading because, in the context of the entire report, the statement does not mean what it appears to say. Although Faggaini reported that Hale could not identify the gunman, he also reported that Hale recognized the gunman's rolled-up shirt sleeve and

28

arm as that of the black male to whom she had given a job application minutes before. These statements are contradictory and render the report misleading and unreliable. We conclude that the trial court properly excluded the Faggaini report.

McClendon, 45 Conn. App. at 670-72 (Internal quotes and citations omitted).

The Connecticut Supreme Court, like the Connecticut Appellate Court, treated the

claim as an evidentiary matter, stating:

As Professor Wigmore points out, the residual exception to the hearsay rule demands "probability of trustworthiness as a practicable substitute for the ordinary test of cross examination. Wigmore also observes: We see that under certain circumstances the probability of accuracy and trustworthiness of statement is practically sufficient, if not quite equivalent to that of statements tested in the conventional manner.

The trial court also had heard Hale testify that she did not see the robber's face during the robbery, but that she could identify him from his clothing and voice as the man who earlier had asked her for a job application. She had denied making the statement that she could not identify the robber. The other facts in the report were otherwise generally consistent with Hale's testimony at trial that she identified the earlier job applicant as the robber who had shot the victims.

The statement was contradicted by the evidence presented at the trial and was not corroborated by any other evidence. The trial court was therefore correct in concluding that the report was not reliable and trustworthy.

In the present case, the state produced other eyewitnesses who saw the defendant leaving the murder scene wearing the same clothing described by Hale at the time the crimes had been committed, and ballistic evidence that placed the murder weapon at the defendant's apartment. We cannot say, in view of all the circumstances, that the trial court abused its discretion in refusing to admit the police report. We agree with the Second Circuit Court of Appeals that the residual hearsay exceptions should be applied in the rarest of cases, and the denial of admission under the exceptions can only be reversed for an abuse of discretion. Evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. The trial court's judgment was not an abuse of discretion, and the Appellate Court's affirmation was proper.

McClendon, 248 Conn. at 584 (internal quotes and citations omitted).

The Connecticut courts treated the claim solely as a state evidentiary claim because petitioner clearly presented it as such. In his brief to the Connecticut Appellate Court; **Appendix R**; the petitioner captioned his entire argument: "THE FAGGIANI [sic] REPORT WAS ADMISSIBLE UNDER THE RESIDUAL EXCEPTION TO THE HEARSAY RULE." **Appendix R** at 28. The petitioner hinted at constitutional implications to the Connecticut Appellate Court by reference to Chambers v. Mississippi, 410 U.S. 284 (1973); **Appendix R** at 30-31; weaving a constitutional thread through an otherwise evidentiary fabric. But it was in the fabric of state evidentiary analysis that the petitioner cloaked his appeal from the trial court's denial of his invitation to admit the report under the hearsay exception. Indeed, the petitioner's reliance on Chambers was misplaced.

In Chambers, the exclusion of a third-party's oral confessions to three different witnesses under circumstances suggestive of trustworthiness was found to eclipse a fair trial. No such testimony was excluded in the instant case. Indeed, here, the witness to whom the petitioner attributes exculpatory statements did, in fact, testify, and was fully available for cross-examination. Accordingly, the petitioner's reliance on Chambers in his appeal to the state courts was misplaced.

To the extent that the petitioner substantively advanced a basis for his claim, he did so on evidentiary grounds. State law evidentiary determinations are not subject to review by federal habeas courts. Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); see also Diguglielmo v. Smith, 366 F.3d 130, 136-38 (2nd Cir. 2004) (even if claims were not defaulted, they only involved matters of state law and, therefore, were not

cognizable in federal habeas proceeding); <u>Tinsley v. Borg</u>, 895 f.2d 520, 530 (9th cir. 1990) ("[i]ncorrect state court evidentiary rulings cannot serve as a basis for habeas relief unless federal constitutional rights are affected. . . ." [internal quotes and citations omitted]). Noncompliance with state evidence rules "is neither a necessary nor a sufficient basis for the grant of federal habeas relief on due process grounds. . . ." <u>Fuller v. Roe</u>, 182 F.3d 699, 703 (9th Cir. 1999) (citations omitted).

Moreover, a claim raised on evidentiary grounds in state court cannot be converted to a constitutional claim upon petition for federal habeas corpus relief.  <u>Duncan v. Henry</u>, 513 U.S. 364, 366, 115 S.Ct. 887, 130 L.Ed.2 865 (1995) (per curiam) (if "a habeas petitioner wishes to claim that an evidentiary ruling . . . denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court.").  For all the above reasons, the petitioner failed to exhaust his claim because he did not fairly present a constitutional basis to the state courts.  Nonetheless, should the Court find that the claim has been exhausted, the state courts' determinations with respect to the hearsay exception issue were not contrary to, nor an unreasonable application of clearly established federal law.

      **2.**      **Even if the Petitioner's Hearsay Exception Claim Were Reviewable, the Connecticut Courts' Determination Was Not Contrary to Nor an Unreasonable Application of Clearly Established Federal Law.**

The Confrontation Clause ("the clause") of the Sixth Amendment to the U.S. Constitution (applied to the states through operation of the Fourteenth Amendment), provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be

31

confronted with the witnesses against him."  U.S. Const. amend XI.  The primary purpose

of the Confrontation Clause is "to secure for the opponent the opportunity of cross-

examination."  Delaware v. Van Arsdall, 476 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.

2d 674 (1986), quoting 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed. 1940) (other

references omitted).  Nonetheless, "trial judges retain wide latitude insofar as the

Confrontation Clause is concerned to impose reasonable limits on such cross-examination

based on concerns about, among other things . . . prejudice, confusion of the issues, the

witness' safety, or interrogation that is repetitive or only marginally relevant."  Van Arsdall,

476 U.S. at 679.

        "While a literal interpretation of the Confrontation Clause could bar the use of any

out-of-court statements when the declarant is unavailable, [the U.S. Supreme Court] has

rejected that view as 'unintended and too extreme.'"  Idaho v. Wright, 497 U.S. 805, 813,

110 S.Ct. 3139, 3145, 111 L.Ed. 2d 638 (1990), quoting Bourjaily v. U.S., 483 U.S. 171,

182, 107 S.Ct. 2775, 2782, 97 L.Ed. 2d 144 (1987).  The admission of hearsay evidence

when a declarant is unavailable does not violate the clause if there is a showing that the

statement bears adequate "indicia of reliability."  Id., quoting Ohio v. Roberts, 448 U.S. 56,

66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980).[15]

_____

        [15]The governing principles of Roberts were overruled by Crawford v. Washington,
541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2 177 (2004).  See Davis v. Washington, 126 S.Ct.
2266, 165 L.Ed.2d 224 (2006) at n. 4 ("Roberts conditioned the admissibility of all hearsay
evidence on whether it falls under a 'firmly rooted hearsay exception' or bears
'particularized guarantees of trustworthiness.'  We overruled Roberts in Crawford by
restoring the unavailability and cross-examination requirements" (internal references
omitted)).  However, Roberts governs the instant matter because federal habeas review
of a state determination must focus on the governing principles existing at the time of that
determination.  See Williams, 529 U.S. at 412, 120 S.Ct. at 1523.    The Connecticut
(continued...)

32

Roberts required (1) a showing of necessity, and (2) "a showing of particularized guarantees of trustworthiness." See Wright, 497 U.S. at 814-15, 110 S.Ct. At 3146, citing Roberts, 448 U.S. at 66, 100 S.Ct. At 2539 (footnote omitted) (emphasis added).  This test mirrors that used by the Connecticut Supreme Court upon certification of the question now at issue:

> The residual, or catch-all, exception to the hearsay rule allows a trial court to admit hearsay evidence not admissible under any of the established exceptions if: (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions.

State v. McClendon, 248 Conn. 572, 583 (emphasis added).

In  Wright, supra, the trial court admitted, through a doctor-witness, statements made by a three year-old to the doctor that incriminated the child's father in inappropriate sexual conduct with the child.  The U.S. Supreme Court summarized the question presented as: Whether the proponent (in that case, the prosecuting state) of evidence, presumptively barred by the hearsay rule and the confrontation clause, has carried his burden of proving that the out-of-court statements bear sufficient indicia of reliability to withstand scrutiny under the confrontation clause.  Wright, 497 U.S. at 816, 110 S.Ct. at 3147.   The corresponding question presented here is: has the petitioner, in propounding evidence presumptively barred by the hearsay rule, carried his burden of proving that the statements in the report bear sufficient indicia of reliability?

---

[15](...continued)
Supreme Court's 1999 determinations with respect to the subject issue pre-date Crawford.

The Connecticut Supreme Court answered this question through a detailed analysis of the report's reliability.  The Court found the report unreliable because: (1) Hale, the declarant, did not sign or otherwise endorse the report and denied having made some of the statements contained therein; (2) the report was ambiguously written and contained internal contradictions; (3) the supposed exculpatory statements were not corroborated by any other evidence and were contradicted at trial; and (4) while the report attributed seemingly impeaching statements to Hale, corroborative evidence supported her testimony at trial.  In engaging in this analysis of reliability and trustworthiness, the Connecticut Supreme Court clearly mirrored the Wright/Roberts approach.  More importantly, because Hale testified at trial, the hearsay was not necessary.  The trial court did not impose any restrictions on the petitioner's cross-examination of Hale.  Accordingly, Connecticut courts' determinations were not contrary to, or a reasonable application of clearly established federal law insofar as they excluded "marginally relevant" hearsay evidence that was neither necessary nor reliable.

    **D.**    **Connecticut Courts' Determination that the Petitioner Received Effective Assistance of Counsel Neither Contravened nor was an Unreasonable Application of Clearly Established Federal Law.**

Next, the petitioner claims that he was denied effective assistance of counsel through three specific assignments of error:

(1) trial counsel refused to impeach Hale with a statement she made to the petitioner's public defenders' investigators two years before trial;

(2) trial counsel refused to call the public defenders' investigators and petitioner's cousin for the purpose of refuting Hale's identification of the petitioner; and

34

(3) trial counsel refused to call Hale to the stand because counsel did not want to cast Hale as a liar.

The state habeas court held that the petitioner failed to establish that "counsel's representation fell below an objective standard of reasonableness" based upon "(1) the tactical decision and sound strategy of [his] trial counsel not to accuse the chief witness of being a liar, but rather as being confused and (2) credibility determinations with respect to the witnesses." McClendon, 248 Conn. App. at 437. The Appellate Court agreed. Id. at 438.

The petitioner's claims relate to a December 8, 1987 report by Irma Grimes and Ellen Knight (see **Appendix M**), inspectors employed by the public defender's office. In the report, Grimes and Knight relate that Hale told them, in summary, that the police pressured her into making an identification, and that the police told her they had a suspect who Hale identified initially as one "McClellar."[16] Assuming that, during the interview, Hale and the inspectors were speaking of the same person, the report further indicates that Hale related that she had been shown a photo of this person, that she told the police the person in the photo was not the perpetrator of the subject crime, and that she knew the person prior to the incident in question through his cousin, an employee of C & K, and because he had previously entered the premises to complete job applications. During the petitioner's trial, almost two years later, Hale testified that she had no doubt that the petitioner was the perpetrator; Tr. 10/31/89 (**Appendix N**) at 59; that she could not recall making some of the statements attributed to her in the inspectors' report, and that some

---

[16]An entry in the investigators' report indicates that, during the interview, Hale "was struggling with the last name." Thereafter, one of the investigators provided the petitioner's name, McClendon, to Hale.

of her other statements related to one Charles McCullen, rather than the petitioner, Charles McClendon. Tr. 10/31/89 (**Appendix N**) at 87-96.[17]    The petitioner claims that his trial counsel did not utilize Hale's statements to Grimes and Knight to impeach her at trial, an omission at the core of petitioner's ineffective assistance claim.

The petitioner's ineffective assistance claim is governed by Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052 (1984). The Supreme Court in Strickland established a two-prong test for ineffective assistance of counsel claims: (1) the petitioner must show that counsel's performance was deficient, and (2) he must show that the deficient performance prejudiced his defense. "Judicial scrutiny of counsel's performance must be highly deferential." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065. There is a strong presumption the action complained of is sound trial strategy. Id. A reviewing court must determine, in light of all the circumstances, that the acts or omissions were "outside the range of professionally competent assistance." Id. at 690, 2066. "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id.

At the state habeas trial, petitioner's two public defenders testified as to the tactical decisions they made in not undertaking the strategy now propounded by the petitioner.[18] Both attorneys were consistent in their testimony. They testified that Hale explained her apparently contradictory statements during the probable cause hearing, diminishing the

---

[17] This testimony by Hale was elicited during cross-examination by the petitioner's defense counsel.

[18] Transcripts of the state habeas testimony of the petitioner's trial counsel, Fred DeCaprio and Susan Storey, are annexed hereto in their entirety, collectively, as **Appendix O**.

36

likelihood that she could be effectively impeached.  One of the attorneys testified, at some

length, about the decision not to call the petitioner's cousin because he offered both

contradictory and discreditable statements.  Both attorneys also testified at length as to

their investigation into possible motives for Hale to fabricate her testimony.  Specifically,

Attorney DeCaprio stated:

> [W]e were certainly willing to consider the possibility that [Hale] was lying.
> So there were many discussions as to why she might be doing so.  Things
> like looking at her divorce case.  Was there some reason that she could be
> involved in this robbery herself and perhaps be covering up for someone?
> Was the person she was covering up from [sic] possibly even her husband?
> Did the police put pressure on her?  Did they have some leverage over her
> to make her say things she did?  We had no formal basis for believing any
> of those things, but certainly they were considered because we wanted to
> consider every possibility.

Tr. 10/28/97 (**Appendix O**) at 9.  Attorney Storey's testimony was consistent:

> We investigated by looking in [Hale's] divorce file, by . . . trying to find some
> reason that the police could put pressure on her to lie about the
> identification.  Investigating her husband, trying to find out why she left the
> state.  We knew she had been pregnant at the time of the shooting, so we
> were wondering if DCF had put any pressure to take her children for any
> reason.  There were several possibilities we tried to follow up.  We could not
> find any conclusive evidence of that, of her lying. . . . she had told us at times
> that she had received some pressure.  But she had also said that she would
> not put somebody in the position of going to the electric chair unless she was
> sure it was the person.

Tr. 10/28/97 (**Appendix O**) at 16.   They further testified that, under all of the

circumstances, including the composition of the jury and the character of the proceedings

to that point in time, a tactical decision was made that it would be of greater benefit to the

defense not to call as witnesses the inspectors and petitioner's cousin, and to portray Hale

as confused rather than deceitful.  See, generally, Tr. 10/28/97 (**Appendix O**) at 5-10, 15-24.[19]

The state habeas court, considering all circumstances, found merit in the reasoning behind the public defenders' decision not to call the subject witnesses and refusal to portray Hale as a liar.  As a result, it held that their representation did not fall below objective standards of reasonableness.  The Connecticut Appellate Court concurred.  Petitioner's trial counsel's strategic choices were founded on thorough investigation and an exploration of the plausible options.  Strickland, 466 U.S. at 690.  Accordingly, the state's determinations were not contrary to, or an unreasonable application of federal law as set forth in Strickland.

### E.    The Petitioner's Claim that the State Habeas Court Abused its Discretion is not Cognizable in this Action.

In his fifth claim, the petitioner complains that the state habeas court abused its discretion in denying him certification to appeal its decision that he received effective assistance of counsel.  Although the underlying claim of ineffective assistance gives rise to a constitutional controversy (which controversy petitioner raises in his fourth claim, discussed above), this claim does not.  Accordingly, it is not cognizable in this forum.  See, e.g., Bellino v. Armstrong, 2007 WL 283090 at *10 (D. Conn.) ("a claim that the state court abused its discretion in denying the petitioner certification to appeal the denial of a state habeas petition is a matter of state law and is not cognizable in [a federal habeas] action."),

---

[19] The testimony of Attorney Storey is most concise: "[W]e felt that by using the investigators that we would be pursuing the strategy that we were calling Darlene Hale a liar rather than showing that she was mistaken.  And that was not the tact to take with this jury or with the way the case was going."  Tr. 10/28/97 (**Appendix O**) at 17.

citing <u>Pennsylvania v. Finley</u>, 481 U.S. 551, 556-57 (1987), <u>U.S. v. MacCollom</u>, 426 U.S. 317, 323 (1976).

## IV.   CONCLUSION

For the reasons set forth above, the respondent respectfully requests that this Court deny the petitioner's claims and dismiss the § 2254 petition attacking the petitioner's 1992 state conviction.

Respectfully submitted,

RESPONDENTS
STATE OF CONNECTICUT
THERESA C. LANTZ
RICHARD BLUMENTHAL


By:   _____
MICHAEL PROTO
Deputy Assistant State's Attorney
Civil Litigation Bureau
Office of the Chief State's Attorney
300 Corporate Place
Rocky Hill, Connecticut 06067
(860) 258-5887
(860) 258-5968 (facsimile)
Fed. Bar. No. CT22533

## CERTIFICATION

I hereby certify that a copy of the foregoing Memorandum of Law in Opposition to the Application for Writ of Habeas Corpus was mailed, first class postage prepaid, to Charlie J. McClendon, Inmate No. 107421, MacDougal-Walker Correctional Institution, 1153 East Street South, Somers, Connecticut 06080, on August 13, 2007.

_____
MICHAEL PROTO
Deputy Assistant State's Attorney

## INDEX TO APPENDICES

| Appendix A | State v. McClendon, 45 Conn. App. 658. The Connecticut Appellate Court's decision with respect to the petitioner's direct appeal of his conviction. |
|---|---|
| Appendix B | State v. McClendon, 243 Conn. 943. The Connecticut Supreme Court's certification to appeal, limited to the three specific issues noted. |
| Appendix C | State v. McClendon, 248 Conn. 572. The Connecticut Supreme Court's decision with respect to the three certified questions emanating from the petitioner's direct appeal of his conviction. |
| Appendix D | McClendon v. Commissioner, 58 Conn. App. 436. The Connecticut Appellate Court's decision affirming the state habeas court's denial of the petitioner's first state habeas petition. |
| Appendix E | McClendon v. Commissioner, 254 Conn. 920. The Connecticut Supreme Court's denial of the petitioner's petition to appeal the Connecticut Appellate Court's decision in 58 Conn. App. 436 (**Appendix D**). |
| Appendix F | McClendon v. Commissioner, 2004 WL 1888857. The Connecticut Superior Court's decision dismissing the petitioner's second state habeas corpus petition. |
| Appendix G | McClendon v. Commissioner, 93 Conn. App. 228. The Connecticut Appellate Court's decision affirming the decision of the state habeas court dismissing the petitioner's second petition. |
| Appendix H | McClendon v. Commissioner, 277 Conn. 917. The Connecticut Supreme Court's denial of petitioner's petition for certification from the Appellate Court's decision at 93 Conn. App. 228 (**Appendix G**). |
| Appendix I | Motion to Suppress filed in petitioner's criminal trial, dated April 23, 1990. |

| Appendix J | Warrant application and accompanying affidavit dated September 14, 1989. |
|---|---|
| Appendix K | Motion for Mistrial filed in petitioner's criminal trial, dated November 30, 1992. |
| Appendix L | Transcript from petitioner's criminal trial, November 18 - 20, 1992. |
| Appendix M | Report of interview of Darlene Hale by public defender's investigators Irma Grimes and Ellen Knight, dated December 8, 1987. |
| Appendix N | Transcript from petitioner's criminal trial, October 31, 1989. |
| Appendix O | Transcript of defense counsels' testimony at petitioner's state habeas hearing, October 28, 1997. |
| Appendix P | Petitioner's Petition for Certification to Appeal to the Connecticut Supreme Court, dated September 29, 1997. |
| Appendix Q | Petitioner's Brief on Certification to the Connecticut Supreme Court, dated |
| Appendix R | Petitioner's Brief to the Connecticut Appellate Court, file dated December 22, 1995. (Indices omitted). |
| Appendix S | Darlene Hale's testimony excerpted from the transcript of trial court proceedings on November 20, 1992, pages 397 through and including 504. |