A    He was a male, black.  He looked to be between the ages of maybe nineteen to twenty-two.  He was what I call a dark coffee color.  Had a close haircut.  He had a jacket or what appeared to be a jacket wrapped around this arm. He was medium built.

Q    Right.  The jacket or the item wrapped around his arm, do you remember the color of it?

A    It's a light color.  Light.  I seem to remember that it might have had something red in it.  I can't describe it exactly because it's been a long time, but it was a light jacket.

Q    Something that?

A    Red.

Q    Okay.  And where did the man go?

A    He went down to the corner of Albany Avenue.

Q    Did you lose sight of him at that point?

A    Yes.

Q    Okay.  By the way, do you know a man named Hector Colon?

A    Yes.

Q    Where does he live?

A    He lives on Liberty Street.

Q    How far is that from you?

A    About a quarter of a block.

Q    What I should ask is how far is his home from your home?

A    There's three homes -- well, there's five homes now

-- I'm sorry, there's still three homes on my street before you get to my house, and then there's another house on Liberty Street right here and then Mr. Colon's house is next to that one.

Q    All right.  So it's a few houses away?

A    Yeah.

Q    The individual you saw, what direction was he walking with reference to C & K Moving Company?

A    He was walking away from it.

Q    Now, did you have occasion to speak with the police on that day?

A    Yes.

Q    And how did that come about?

A    They knocked on my door and they asked me if I had heard or seen anything.  So I told him yes, I'd heard things.  And he asked me if I'd seen anybody and I told him yes.  So then they asked me what did the persons look like and I described him to the police.

Q    Okay.  And did you have occasion to see the police after that day?

A    Yes.

Q    How many days later?

A    I guess it was about two or three days later.  They came back to my house again and they had some pictures and they asked me if I would look at them.

Q    Okay.  Did you agree to look at them?

A    Yes.

Q    Do you remember, Ms. Thompson, at this point whether they were Polaroid pictures or some other type of pictures?

A    They were Polaroid types.

Q    And how many were there, if you recall?

A    I guess there were about maybe -- I don't know, maybe about four or five.

Q    Okay.  And what did the police ask you to do?

A    They asked me to look at see if I recognized anybody in those pictures.

Q    And did they hand them to you or did they spread them out?

A    They handed them to me.

Q    And what did you do with them?

A    I looked at them.

Q    Did you look at them one after another?

A    I looked at them one after another.  And then they held them this way -- a couple of them this way for me and they asked me like this if I'd seen this person before.  And I said no.  And then they shuffled them around again and asked me to take another look, and he asked me again if I'd seen this person before, and I said no.  They they asked me if I knew any of these who lived in my area, and I said no.

Q    All right.  Was the man you had seen walking by your house in that group of pictures?

A    No.

Q    Now I'm going to ask you to look at the gentleman seated next to where I'm standing.  And my the record reflect I'm indicating the defendant, Your Honor.

THE COURT:  The record may so reflect.

BY MR. DECAPRIO:   (continuing)

Q    Is this the man who walked by your house that day?

A    No.

Q    Now, when the police showed you the pictures do you recall whether or not a picture of this man was present?

A    Yes.

Q    Was it?

A    Yes.

Q    And with respect to the way the police showed you the pictures did they attempt -- did they do anything to point out one picture more than any other?

A    Yes.

Q    Which picture was that?

A    Well, I won't swear, but it looked like this fellow right there.

Q    All right.   What did the police do with respect to his picture?

A    They asked me if I was sure that I've never seen him before.

Q    And did they ask me that one time?

A    No, they asked me a couple of times.

Q    Did they do that with the other pictures?

A    No.   They only pointed to one picture more than one time.

        MR. DECAPRIO:   Thank you.   I have no further questions.

CROSS-EXAMINATION BY MR. MALONE:

Q    Did you see Hector Colon that afternoon?

A    No.

Q    You could see his yard from your house, couldn't you?

A    No.

Q    Do you know where the lot used to be, maybe still is, next to his house?

A    Yes.

Q    Can you see that if you look down the street?

A    No.  If I go in my back yard I can.

Q    Okay.  You can't see it from the front?

A    No.

Q    Okay.  And did you see the individual coming from that area, where that lot was?

A    I saw the individual coming from Liberty Street down Brook Street, which is where I live on.

Q    Okay.  Now the first time you saw him was he on Brook Street?

A    Yes.

Q    Okay.  So you didn't see him on Liberty Street at all, did you?

A    I saw him come from Liberty Street down Brook Street.

Q    I understand that.  Let me just go back to my question. When you saw him what street was he on?

A    He was walking from Liberty Street down Brook Street. I saw him come from Liberty Street down Brook Street.  You can't come any other way but Liberty Street to get to my house.

Q    What part of Liberty Street did you see him on?

A    Liberty and Brook.

Q    At the corner?

A    Yes.

Q    You didn't see him come from near Hector Colon's house, did you?

A    I didn't see him coming any special direction.

Q    Okay.  And you watched him all the way?

A    Yes.

Q    Did you see anyone else that day or that afternoon, walking along the street?

A    Yes.

Q    Now this person wasn't running, was he?

A    No.

Q    He was walking?

A    He was walking.

Q    And by suspicious what do you mean?

A    I mean he looked as if he was up to something.  And I was aware of it because I have been robbed and because of the area that I lived in.  And when somebody's going shifty, you know, like going like this you notice it.

Q    Yes, like he was checking out the place?

A    Right.

Q    Looking for a house to hit?

A    I don't know.  He just looked shifty.

Q    Is that what you thought he was looking for, a house to get into?

A    I didn't know what he was doing, but I was watching because I was aware of anybody shifty coming down my street because of the burglarys.

Q    So he didn't look like he was running away from something, he was looking like he was looking for something to get into, is that your impression?

A    My impression was that he was coming down my street and he was looking around and to me he looked shifty.

Q    Okay. And did he look like he was running away from something?

A    He wasn't running at all.

Q    Okay. Did he look like he was -- was he looking at the houses as he was walking by?

A    He was looking at the houses, he was looking back at the corner, he was looking -- at that time it was an empty lot by my house, too, and he was looking through there.

Q    Okay. And that was a few minutes after the noise that you felt were gunshots?

A    Right.

Q    Okay. And he might have been looking back to see what those were, too?

A    No, he was not.

Q    How could you tell that?

A    Because it was over. The shots had stopped.

Q    Okay. He wasn't looking to see if anything more happened in that direction, you're sure?

A    I don't know what his purpose for looking was. But

he looked shifty to me, and that's what made me aware of him.

Q     And you were concerned about a break in -- another break in?

A     I was concerned about anybody coming down my street that looked as if they might be looking for some kind of trouble or might be in some kind of trouble.

Q     And he walked all the way to Albany?  You watched him walk all the way?

A     Yes.

Q     And not once did he break into a run, did he?

A     No.

Q     Okay.  And did he continue to look from side to side at the houses?

A     Yes.  And back --

Q     And back towards you?

A     Yes.

Q     Did he see you?  Did your eyes meet at all?

A     Yes.

Q     Okay.  And he looked back to see if you were watching him?

A     I don't know if he looked at me in particular, just surveying the entire area.

Q     Okay.  And was he carrying anything at the time, if you remember?

A     Yes, his jacket across his arm.

Q     Other than his jacket?

A     It was wrapped around his arm.

Q    Do you remember what kind of shirt he had on?

A    No.  I think he had on a teeshirt, but I can't tell you -- I don't remember what color.  Basically I looked at his face, I looked at his hand because of the way he had the jacket wrapped, and I watched him as he was going down.

Q    And was anyone else -- you said we were in the house, was anyone else with you?

A    Yes.

Q    Okay.

A    My daughter.

Q    Did she come out and see this, too?

A    No, I wouldn't allow her.  She was about eight at the time.

Q    Oh, sure.  And you looked at all the pictures the police showed you?

A    Yes.

Q    And not one looked like the person that you saw, is that correct?

A    No.

Q    Including a person that looked like the defendant in the picture, but that wasn't one of the ones you saw?

A    It wasn't him that I saw in the picture.

Q    Okay.  It wasn't him that you saw in the street?

A    Right.

Q    And nobody else that you saw in the picture did you see on the street?

A    No.

MR. MALONE:  Okay.  Thank you very much, Ms. Thompson.

MR. DECAPRIO:  No re-direct.

THE COURT:  Thank you very much, ma'am.

MR. DECAPRIO:  Your Honor, at this point --

THE COURT:  Wish to approach?

MR. DECAPRIO:  Yes.

THE COURT:  I'm going to give counsel a ten minute recess.  There is another witness.  Everybody holding up okay?  Wonderful.  I really appreciate the nothing short of heroics.  But don't discuss the case, don't speculate.  Ten minutes should do it.  The jury's excused for recess.  I'll just stay on the bench to get the record clear on scheduling.  All right.  You have a witness, you're going to talk to him -- him or her for the next ten minutes and we'll go from there.  You may have others, but maybe not today?

MR. DECAPRIO:  I would suspect that this may conclude it, but I just can't represent that to Your Honor at this point.

THE COURT:  All right.  Well I don't mind ending an hour early.  I mean, I've ended an hour early for the State once.  But that raises some problems for tomorrow.  We'll deal with them.  The State can get you off the hook if you're going to have rebuttal.  We can keep the jury busy tomorrow morning.  But you can consider that.  You don't need to answer now.

-1959-

MR. MALONE:    We are.    It's just kind of hard to find out what we're doing on this.  It's --

THE COURT:    All right.    Nobody said that this was going to be easy for either or you guys.    Ten minutes enough?    Ten minutes.

-RECESS-

THE COURT:    Did you have enough time, Mr. DeCaprio?

MR. DECAPRIO:    Yes, I did, Your Honor.    We are completed with evidence for today.

THE COURT:    Oh, you're not going to call the witness you just talked to?

MR. DECAPRIO:    No, I'm not.

THE COURT:    All right.

MR. DECAPRIO:    Your Honor, I can't tell the Court at this point whether we're ready -- we're not ready to rest.    With respect to the remainder of the evidence there are possibly three witnesses, probably fewer. No more.    We won't know that until the morning.

THE COURT:    All right.    So tomorrow morning you'll be ready to proceed with evidence or rest?

MR. DECAPRIO:    Yes.    As of ten o'clock.

THE COURT:    All right.    Now that means I bring the jury in at ten o'clock?

MR. DECAPRIO:    All right.

THE COURT: Well, I assume that's what we have to do. I'm willing to give you an hour after the close of evidence to finish preparing an argument. You were talking about not arguing till two p.m., and I'm reluctant to just have the jury sit here for four hours with nothing to do. Your thoughts on that?

MR. DECAPRIO: I don't --

THE COURT: The State may take you off the hook with rebuttal and provide the filling testimony so argument doesn't happen until two anyway. Your thoughts if the defense has no evidence tomorrow at ten o'clock?

MR. MALONE: Probably no -- very little rebuttal, probably none, Your Honor.

THE COURT: But you'll be ready to go from ten o'clock on, or --

MR. MALONE: I'll be ready to argue at ten.

THE COURT: You'll be ready to go? Yes, but I mean in terms of rebuttal, you'll be ready to have a witness within a half an hour of the defense resting?

MR. MALONE: Our plan is to have them here at ten.

THE COURT: Okay. Good, I approve. So we can't do any more than send the jury home. All right. Of course, we may have a sick juror, which will -- the quicker we get her home and rested the better off we'll be. Can we have the jury, please? Welcome back, folks. The record will reflect you're all here.

We're out of evidence for today. We may be completing evidence at sometime tomorrow, and we may even get as far as final argument tomorrow -- maybe not. But does everyone thing ten o'clock tomorrow morning make sense? I don't want anybody to push themselves beyond -- anyone to push him or herself further than good health requires. But it does appear that sometime on Thursday the case may well be in your hands, unless it isn't. And as you know by now, although I wish I could control things so that I know exactly when we'll be doing every step of the way, that's simply not possible. We've tried to keep you informed as we go. But things happen that are outside the control of the Court or of counsel. And you've been very patient and I hope we won't have to tax that patience too much anymore. Please remember, as I'm sure you will -- we can probably all say it in unison by now -- that you must not discuss the case with anyone or permit anyone to discuss the case with you. Don't talk about the case or anyone who has anything to do with the case. Keep an open mind until the last bit of evidence, all of the arguments and my charge to you on the law has been completed, and finally the case will be in your hands for deliberation. Have a pleasant evening, the jury is excused. I'm going to finish preparing the charge tonight. Obviously I haven't ordered any earlier requests to charge, so the start of argument's fine in accordance with

the rules.   If counsel would like a general charge conference now I'm amenable.   If it's more important to have a better grasp of just exactly what words I'm going to say, to the extent that I can provide that for you -- that will have to be of course later -- then we can do that before argument starts on Wednesday, whichever you prefer.

THE COURT:  I think for me later.

MR. DECAPRIO:   Yes, Your Honor.   Otherwise I think we may be doing it twice.

THE COURT:  Promise you won't do that.  All right. I'll finish putting it together then.   Am I going to get extensive requests to charge from anyone? I'm not requesting any, but --

MR. DECAPRIO:  No, Your Honor.

THE COURT:  Wish to give me some idea in what areas they'll be coming?  You don't have to.

MR. DECAPRIO:  Well I can't, but cocounsel can.

MS. STOREY:   Yes, Your Honor.   Circumstantial evidence, capital felony intent, credibility of witnesses, presumption of innocence, reasonable doubt.  I can't think of any other ones we have.

THE COURT:  Anything particularly exotic?

MS. STOREY:   Not particularly, just a different wording than perhaps --

THE COURT:   Would you please adjourn Court? Ten a.m. tomorrow.

HERE END THE PROCEEDINGS OF DECEMBER 15, 1992