UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------------------------------x
                                             :
CHARLIE J. McCLENDON                         :
                                             :        3:01 CV 1490 (JBA)
v.                                           :
                                             :
STATE OF CONNECTICUT, ET AL.                 :
                                             :        FEBRUARY 14, 2008
-------------------------------------------------------x
```

<u>RECOMMENDED RULING ON PETITIONER'S AMENDED PETITION FOR WRIT OF HABEAS CORPUS</u>

On August 9, 2001, petitioner Charlie J. McClendon filed his initial Petition of Habeas Corpus, <u>pro se</u>, pursuant to 28 U.S.C. § 2254.  (Dkt. #1).[1]  On April 5, 2005, petitioner's Petition for Writ of Habeas was dismissed by United States District Judge Janet C. Hall, without prejudice to petitioner filing a motion to reopen the case after "he has fully exhausted all available state court remedies as to grounds four, five and six" of his eight-ground Petition.  (Dkt. #20; <u>see</u> Dkt. #21).

On March 17, 2006, petitioner filed his Motion to Reopen and Motion to Amend his Petition for Writ of Habeas Corpus, which Judge Hall denied on June 5, 2006, on grounds that petitioner did not comply with the exhaustion requirement set forth in the April 5, 2005 Order, and on grounds that petitioner sought to reopen his petition to assert new claims of ineffective assistance of counsel.  (Dkts. ##22-24).  On June 22, 2006, petitioner filed  his second Motion to Reopen and his third Petition for Writ of Habeas Corpus; on March 12, 2007, Judge Hall granted petitioner leave to file his amended petition and thus reopened this case. (Dkts. ##25-26, 28-30).

---

[1]Plaintiff filed two Motions to Appoint Counsel (<u>see</u> Dkts. ##2, 27), both of which were denied.  (Dkts. ##3, 33).

Petitioner's pending Amended Petition for Writ of Habeas Corpus was filed on March 12, 2007 (Dkt. #29),[2] and eighteen days later, the case was transferred to United States District Judge Janet Bond Arterton. (Dkt. #31). Petitioner asserts the following five claims: (1) the Connecticut state courts improperly denied petitioner's motion to suppress identification evidence; (2) the Connecticut state courts improperly suppressed an exculpatory police report; (3) the Connecticut state courts improperly refused petitioner's request to introduce an exculpatory police report under the residual exception to the hearsay rule; (4) petitioner was denied effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments; and (5) the state habeas court abused its direction in determining that petitioner received effective assistance of counsel and in refusing to allow petitioner to appeal its dismissal of petitioner's writ of habeas corpus. (Dkt. #29). On August 13, 2007, respondents filed their brief in opposition (Dkt. #41),[3] in response to which petitioner filed

---

[2]Attached to petitioner's Amended Petition (Dkt. #29) is Judge Hall's June 5, 2006 Ruling in this case.

[3]Attached to respondent's brief in opposition (Dkt. #41) are the following: copy of Memorandum of Decision from State v. McClendon, 45 Conn. App. 658, 697 A.2d 1143 (Conn. App. Ct. 1997)(Exh. A)["McClendon I"]; copy of Memorandum of Decision from State v. McClendon, 243 Conn. 943, 704 A.2d 799 (1997) (Exh. B)["McClendon II"]; copy of Memorandum of Decision from State v. McClendon, 248 Conn. 572, 730 A.2d 1107 (1999)(Exh. C)["McClendon III"]; copy of Memorandum of Decision from McClendon v. Comm'r of Corr., 58 Conn. App. 436, 755 A.2d 238 (Conn. App. Ct. 2000)(Exh. D)["McClendon IV"]; copy of Memorandum of Decision from McClendon v. Comm'r of Corr., 254 Conn. 920, 759 A.2d 1025 (2000)(Exh. E)["McClendon V"]; copy of Memorandum of Decision from McClendon v. Comm'r of Corr., No. CV020469477S, 2004 WL 1888857 (Conn. Super. Ct. July 21, 2004)(Exh. F)["McClendon VI"]; copy of Memorandum of Decision from McClendon v. Comm'r of Corr., 93 Conn. App. 228, 888 A.2d 183 (Conn. App. Ct. 2006)(Exh. G)["McClendon VII"]; copy of Memorandum of Decision from McClendon v. Comm'r of Corr., 277 Conn. 917, 895 A.2d 789 (2006)(Exh. H)["McClendon VIII"]; copy of Motion to Suppress, filed on April 24, 1990 in State v. McClendon, No. CR 89-372775, and Memorandum of Decision on "Motion to Suppress," dated February 22, 1996 (Exh. I); copy of warrant application and accompanying affidavit, dated September 14, 1989 (Exh. J); copy of Motion for Mistrial, filed on November 30, 1992 in State v. McClendon, No. HHDCR890372775 (Exh. K); copy of transcript from petitioner's criminal trial, taken on November 18, 19 and 20, 1992 (Exh. L); copy of Interview of Darlene Hale, taken by Public Defender's Office Investigators, Irma Grimes and Ellen Knight, on December 8, 1987 (Exh. M); copy of transcript from petitioner's probable cause hearing, taken on October 31, 1989 (Exh. N); copy of transcript of defense counsels' testimony at petitioner's first

his reply briefs on September 5, 2007. (Dkts. ##42-43).[4] On December 12, 2007, Judge Arterton referred this pending Amended Petition for Writ of Habeas Corpus to this Magistrate Judge. (Dkt. #44).

For the reasons stated below, petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. #29) is underlined denied.

## I. FACTUAL SUMMARY

Pursuant to 28 U.S.C. § 2254(e)(1), "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." See also Wiggins v. Smith, 539 U.S. 510, 541, n.1 (2003). "[B]asic, primary, or historical facts are the factual issues to which the statutory presumption of correctness dominantly relates." Thompson v. Keohane, 516 U.S. 99, 110 (1995)(internal quotations & citations omitted); see also Lupien v. Clarke, 403 F.3d 615, 620 (8th Cir. 2005)(explaining that § 2254(e)(1) was formerly codified as § 2254(d)). The Connecticut Supreme Court's presentation of facts relevant to the habeas corpus petition is recited below. State v. McClendon, 248 Conn. 572, 574-77 (1999)["McClendon III"].

On August 11, 1987, at approximately 4:40 p.m., Darlene Hale was at her desk at C

---

habeas hearing, taken on October 28, 1997 (Exh. O); copy of petitioner's Petition for Certification to Appeal to the Connecticut Supreme Court, dated September 29, 1997 (Exh. P); copy of petitioner's brief on Certification to the Connecticut Supreme Court, undated (Exh. Q); copy of petitioner's brief to the Connecticut Appellate Court, filed December 22, 1995 (Exh. R); and copy of excerpts of transcript of testimony from Darlene Hale, taken on November 20, 1992 at petitioner's criminal trial (Exh. S).

[4]Attached to Dkt. #43 is the testimony transcript of defense witness, Minnie Thompson, taken at petitioner's criminal trial.

& K Moving Company ["C & K"] at 211 Walnut Street in Hartford, CT.  (<u>McClendon III</u>, 248 Conn. at 574).  A man described as five feet six or seven inches tall, weighing between 150 and 165 pounds, entered C & K and requested a job application.  (<u>Id.</u>).  The man was African-American, had short dark hair, a moustache and pockmarked face, and was wearing a blue shirt with rolled-up sleeves and gold-rimmed tinted glasses.  (<u>Id.</u> at 574-75).  Hale handed the man an application, and at that time, Dennis Shortell, the owner of C & K, asked Hale to place a telephone call.  (<u>Id.</u>  at 575).  After Hale made the call, the man came up behind her, put a silver and black gun to her head and demanded money.  (<u>Id.</u>).  Hale noticed that the man had the same rolled-up blue shirt sleeves and the same voice as the man to whom she had given the job application.  (<u>Id.</u>).  As Hale emptied her wallet into the robber's bag, Grayland Cannon, another C & K employee, walked in; the robber demanded money from him and when he responded that he did not have any, the robber shot him. (<u>Id.</u>).  The robber then went to Shortell's office, demanded money, shot Shortell and fled. (<u>Id.</u>).  Both Cannon and Shortell died from their injuries.  (<u>Id.</u>).

At approximately 4:45 p.m. the same day, from his residence in the vicinity of C & K, Hector Colon heard "three or four" gunshots and subsequently saw a African-American male "walking real fast . . . looking backwards." (<u>Id.</u> at 575).  The man was wearing a blue shirt with "no sleeves" and carrying a brown paper bag.  (<u>Id.</u>).  Stephen Tinker, who was also in the vicinity of C & K around the same time, observed a man wearing gold-rimmed tinted eyeglasses and a blue and white striped shirt.  (<u>Id.</u>).  Shirley Lassiter also saw a man wearing a "blue short sleeve shirt" and walking fast.  (<u>Id.</u>).  Both Tinker and Lassiter later identified the man they saw that day as petitioner from an array of photographs and also identified him at his criminal trial. (<u>Id.</u>).

4

Within minutes of the shootings, the Hartford police arrived and Hale gave them a description of the job applicant. (Id. at 575). At approximately 5:00 p.m., police detectives arrived and Hale gave them an even more detailed description, describing the applicant as an African-American man, twenty to twenty-five years old, medium complexion, short cropped hair, about five and one-half feet tall, and about 150 pounds. (Id.). Hale described him as wearing a light blue dress shirt, untucked, with the sleeves rolled-up and most of the buttons undone. (Id. at 575-76). He had a moustache and was wearing gold-rimmed glasses with a yellow tint. (Id. at 576). Hale gave the police a sworn statement at the police station at approximately 8:00 p.m. that night, and while she was at the station, she assisted the police in developing a composite sketch of the robber. (Id.).

In the days immediately following the robbery at C & K, Hale was also shown three photographic arrays, including one on August 12, 1987 when she did not make an identification from an array of photographs of African-American men with eyeglasses that did not include petitioner, and on August 14, 1987 when she did not identify petitioner from two arrays of photographs that included petitioner. (Id. at 576). Hale informed police that she could not identify any one photograph as that of the job applicant and she told the police that she needed to see the job applicant in eyeglasses in order to identify him. (Id.).

Relying on the findings of the Connecticut Appellate Court, the Connecticut Supreme Court found that on August 13, 1987, police executed a search and seizure warrant on petitioner's residence; in the apartment, police found a twenty-two caliber handgun with a silver cylinder and white plastic grips. (Id. at 576). The forensic firearms examiner, James McDonald, testified at trial that in his opinion, "all three of those [bullets that killed Shortell and Cannon and injured a victim in another uncharged robbery] were fired from [the gun

found in the [petitioner's] apartment] and no other revolver." (Id., quoting State v. McClendon, 45 Conn. App. 658, 661 (App. Ct. 1997)(additional alteration added)["McClendon I"]).

Two years after the C & K robbery, in September 1989, petitioner was incarcerated on unrelated robbery charges. (Id. at 576). On seven or eight occasions during those two years, Hale was shown several arrays that included a photograph of petitioner, but she could not identify petitioner as the man in the gold-rimmed tinted glasses who had asked her for the job application. (Id. at 576-77). In May 1989, Detective Ronald Faggaini of the Hartford Police Department contacted Hale when he took over the investigation of the C & K robbery. (Id. at 577). Hale told him that since she had not seen the robber's face, she could not identify the robber. (Id.). She also said that she recognized the robber's arm as that of a man to whom she had given the job application minutes before the robbery. (Id.). Shortly thereafter, Hale told the State's attorney that she might be able to recognize the robber's voice if she heard it again; accordingly, the police secured a search and seizure warrant authorizing petitioner to be placed in a line-up and to give a voice sample. (Id.).

On September 15, 1989, Hale viewed a line-up with six African-American men and heard the men speak. (Id. at 577). From the line-up and voice sample, Hale identified petitioner as the gunman. (Id.). Subsequently, petitioner was charged with and found guilty of the C & K robbery and murders. (Id.). Specifically, petitioner was convicted of two counts of felony murder in violation of CONN. GEN. STAT. § 53a-54c,[5] two counts of robbery in the

_____

[5]CONN. GEN. STAT. § 53a-54c: Felony murder:

A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit robbery, burglary, [or] kidnapping, . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the

6

first degree in violation of CONN. GEN. STAT. §§ 53a-134(a)(1), (2)[6] and (4), and of an attempt

to commit robbery in the first degree in violation of CONN. GEN. STAT. §§ 53a-49(a)(2)[7] and

53a-134(a)(2) and (4).[8]   (Id. at 574).   Petitioner was sentenced to one hundred and forty

years imprisonment.   (Dkt. #41, at 2; see also McClendon v. Comm'r of Corr., 58 Conn. App.

436, 437 (App. Ct. 2000))["McClendon IV"].

Petitioner appealed his conviction on grounds that the trial court improperly denied

his motions to suppress identification, excluded the testimony of a defense expert on the

subject of eyewitness identification, suppressed a certain police report, admitted evidence

of other crimes committed by petitioner, and concluded that the State presented sufficient

evidence of the identity of the defendant as the perpetrator of the crimes for which he was

found guilty.   (Dkt. #41, Exh. A; McClendon I, 45 Conn. App. at 659-60).   The Connecticut

Appellate Court upheld petitioner's conviction in his first direct appeal (McClendon I, 45 Conn.

App. at 661-79), and the Connecticut Supreme Court   upheld petitioner's conviction.

---

participants . . . .

[6]CONN. GEN. STAT. § 53a-134: Robbery in the First Degree: Class B Felony:

(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime of robbery . . . or of immediate flight therefrom, he or another participant in the crime: (1) Causes serious physical injury to any person who is not a participant in the crime; or (2) is armed with a deadly weapon; or . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm . . . .

[7]CONN. GEN. STAT. § 53a-49: Criminal Attempt:

(a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

[8]See n.6 supra.

(<u>McClendon III</u>, 248 Conn. at 578-90).

Petitioner filed a Petition for Writ of Habeas Corpus with the Connecticut Superior Court for the Judicial District of Hartford, in which petitioner claimed that he was "denied his state and federal constitutional rights to effective assistance of counsel on grounds that his trial counsel[:] (1) failed to conduct a full cross-examination of the chief witness against the petitioner[,] and (2) failed to call certain witnesses who would have assisted in the impeachment of the chief witness."  (<u>See</u> Dkt. #41, Exh. D; <u>McClendon IV</u>, 58 Conn. App. at 437).  The habeas court dismissed his petition and denied his subsequent petition for certification to appeal, and petitioner's appeal to the Appellate Court was dismissed on June 27, 2000 (<u>id.</u> at 437-38); the Connecticut Supreme Court denied petitioner's appeal on October 2, 2000.  (<u>See</u> Dkt. #41; Exh. E; <u>McClendon v. Comm'r of Corr.</u>, 254 Conn. 920 (2000)["<u>McClendon V</u>"]).

Petitioner filed his second Amended Petition for Writ of Habeas Corpus with the Connecticut Superior Court for the Judicial District of New Haven on November 14, 2003, in which petitioner claimed that his trial counsel were ineffective because they: (1) failed to adequately prepare Michael Leippe, a defense expert on eyewitness identification, so as to prevent the court's exclusion of Leippe's testimony and make a record that would allow an appellate court to determine that the trial court, in excluding such evidence, abused its discretion, and (2) failed to adequately research the issue of uncharged misconduct so as to keep out evidence of other robberies and have a stronger record on appeal. (Dkt. #41, Exh. F; <u>McClendon v. Comm'r of Corr.</u>, No. CV 0204694775, 2004 WL 1888857, at *1 (Conn. Super. Ct. July 21, 2004)["<u>McClendon VI</u>"]).  The petition was denied on July 21, 2004.  (<u>Id.</u> at *1-2).  The Connecticut Appellate Court affirmed the denial on January 17, 2006 (<u>see</u> Dkt.

8

#41, Exh. G; McClendon v. Comm'r of Corr., 93 Conn. App. 228, 230-32 (App. Ct. 2006)["McClendon VII"]), and certification to the Connecticut Supreme Court was denied on March 2, 2006. (Dkt. #41, Exh. H; McClendon v. Comm'r of Corr., 277 Conn. 917 (2006)["McClendon VIII"]).

As discussed above, petitioner filed the instant petition on August 9, 2001 in this Court, originally raising the five grounds for relief at issue in the pending petition and three additional grounds: (1) that the trial court improperly refused to admit expert witness testimony on the subject of eyewitness identification and memory retention; (2) that the trial court erred in admitting evidence of other crimes; and (3) that there was insufficient evidence of his identity to sustain petitioner's conviction for robbery. (Dkt. #1). On September 10, 2002, Judge Hall granted respondent's Motion to Dismiss as to the three unexhausted grounds for relief, and stayed proceedings as to the remaining grounds. (Dkt. #15). Petitioner ultimately never filed a petition with the state court seeking relief on the three unexhausted grounds.

On April 5, 2005, Judge Hall vacated the stay as to the exhausted grounds, thereby dismissing the case without prejudice to petitioner filing a motion to reopen after he fully exhausted all available state court remedies. (Dkt. #20). On March 17, 2006, petitioner moved to reopen the case with a proposed amended petition in which he set forth the five grounds for relief pending in this Amended Petition and an additional ground that the Connecticut courts' dismissal of his second state habeas as a successive petition violated his Sixth and Fourteenth Amendment rights. (See Dkt. #23). On June 5, 2006, Judge Hall denied petitioner's motions because the sixth ground for relief and parts of his ineffective assistance of counsel claims were new claims barred by the one-year statute of limitations

9

pursuant to 28 U.S.C. § 2244(d). (Dkt. #24).   Following Judge Hall's directive, on June 22, 2006, petitioner filed again motions to reopen and amend, which were granted by Judge Hall on March 12, 2007.  (Dkts. ##25-26, 28-30).

## II. DISCUSSION

A federal court shall "entertain an application for a writ of habeas corpus [on] behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  There are two conditions that must be satisfied for a writ to issue under § 2254(d)(1) –  "the state-court adjudication resulted in a decision that (1) 'was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States,' or (2) 'involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.'"  <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000), <u>quoting</u> 28 U.S.C. § 2254(d).[9]

Under the "unreasonable application" clause, the writ may be granted if the federal habeas court determines that the state courts identified the correct governing legal principle from decisions of the U.S. Supreme Court, but "applie[d] [that principle] unreasonably to the

---

[9]28 U.S.C. § 2254(d) provides in relevant part:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

facts" of petitioner's case.  <u>Williams</u>, 529 U.S. at 407-08.  "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous."  <u>Wiggins</u>, 539 U.S. at 520 (citation omitted).  "The state court's application must have been 'objectively unreasonable.'" <u>Id.</u> at 520-21 (citation omitted).   Under the "contrary to" clause, this Court may grant the writ "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts."  <u>Williams</u>, 529 U.S. at 412-13.

### A. IMPROPER DENIAL OF PETITIONER'S MOTION TO SUPPRESS IDENTIFICATION EVIDENCE

Petitioner claims that the Connecticut courts erred in denying his motions to suppress;[10] specifically, petitioner claims that the search and seizure warrant authorizing the line-up and voice sample, and the identification procedures employed, were unnecessarily

---

[10]<u>See</u> Dkt. #41, Exh. I, Motion to Suppress, dated April 23, 1990.  Petitioner moved for an order suppressing the "fruits of an illegal search and seizure any photographs and/or . . . recordings of the [d]efendant's person and/or voice . . .[and] any corporeal identifications" made of defendant as a result of the September 15, 1989 line-up.  Petitioner's claim is based on the "fruit of the poisonous tree doctrine," developed in the context of the Fourth Amendment in <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963), in which the Court held that evidence and witnesses discovered in an illegal search in violation of the Fourth Amendment must be excluded from evidence.

In this Amended Petition for Writ of Habeas Corpus, petitioner moves, pursuant to the Fourth, Fifth and Six Amendments to the United States Constitution, for an order suppressing as the fruits of an illegal search and seizure, any photograph, video or audio tape recording of petitioner's person and voice, along with any corporeal identification of petitioner made as a result of the September 15, 1989 line-up, in that the affidavit in support of the search and seizure warrant contained insufficient facts from which to make an independent finding of probable cause, said evidence was the result of an unlawful seizure of petitioner's person, and said evidence was obtained without petitioner's consent.  (Dkt. #29, at 6).  Additionally, petitioner moves to suppress any identification testimony concerning petitioner by Darlene Hale, regarding either pretrial or in-court identification, which the State used at the time of trial, in that the identification procedure was unnecessarily suggestive and irretrievably tainted by the prior illegal identification and thus lacks an independent basis, any identification offered failed to meet the standard of reliability, and the identification was the product of an illegal custody. (<u>Id.</u> at 7); <u>see</u> Section II.A.3. <u>infra</u>.

11

suggestive. (Dkt. #29, at 6-7). Petitioner argues that petitioner was the "only person in the line-up who[m] Hale had seen before . . . (in [the] photographic arrays she [was] shown over the course of two years)[,] and . . . the identification was unreliable under the circumstances." (Dkt. #43, at 6).[11] According to petitioner, Hale "only saw what she thought may [be] the perpetrator for only [thirty] second[s] to a minute [as] she had her head turn[ed] throughout the initia[l] incident."  (Id. at 7)(punctuation alterations omitted). Petitioner posits that Hale was made aware that a suspect was arrested on unrelated charges and she viewed countless photographs of petitioner before making her identification two years later, and the identification was made from a group of men not wearing eyeglasses. (Id. ). Petitioner claims that there was nothing in the search and seizure warrant that clearly established probable cause; the police had the "same information from Hale [from] August 11, 1987 to September 15, 1989"; and it was not until two years of pressuring Hale that she identified petitioner. (Id. at 8). Petitioner further argues that despite Hale's 1987 and 1989 statements and the information in the search and seizure affidavit and arrest warrant, police could not secure a warrant. (Id.). According to respondent, petitioner's claims regarding the search and seizure warrant are not cognizable in this action, and even if cognizable, the warrant was supported by probable cause. (Dkt. #41, at 11-24).

####      1. APPLICATION OF STONE V. POWELL, 428 U.S. 465 (1976) & EXHAUSTION REQUIREMENT

There are two legal hurdles that petitioner must, but cannot, clear in order for him to succeed on his claim in favor of exclusion. The first is, as respondent correctly contends, if petitioner's claim is construed as brought under the Fourth Amendment rather than the

---

[11]The page numbering on petitioner's brief differs from the automatic page numbering by CM/ECF; in this ruling, the Court will cite the automatic page numbering done by CM/ECF.

Connecticut Constitution, such claim is not cognizable pursuant to <u>Stone v. Powell</u>, 428 U.S. 465, 493-95 (1976).[12]  The second is that petitioner brought his underlying claim as a violation of article first, § 9 of the Connecticut Constitution, not as a Fourth, Fifth or Sixth Amendment claim that he seeks to litigate in this habeas review.[13]  Accordingly, as discussed further below, petitioner has failed to exhaust his federal constitutional claims before presenting them to this Court.

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and the exclusionary rule, upon which petitioner relies, is a "judicially created means of effectuating the rights secured by the Fourth Amendment." <u>Stone</u>, 428 U.S. at 482.  The U.S. Supreme Court concluded in <u>Stone</u> that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. at 494 (footnotes omitted).  While the exclusionary rule serves to deter Fourth Amendment violations, the issue of exclusion is separate from whether the Fourth Amendment has been violated.  <u>Id.</u> at 492-95.  "As with any remedial device, the [exclusionary] rule's application has been restricted to those instances where its remedial objectives are thought most efficaciously served. Where the exclusionary rule does not result in appreciable deterrence, then, clearly, its use . . . is unwarranted." <u>Arizona v. Evans</u>, 514

---

[12]As addressed below, petitioner only refers to a Fourth Amendment claim in a footnote in his brief for Certification to the Connecticut Supreme Court. (<u>See</u> Dkt. #41, Exh. Q, at 7, n.7). Petitioner presented his claim to the Connecticut Appellate and Supreme Courts under the Connecticut Constitution, article first, § 9, and relied on Connecticut state cases in his Petition for Certification to Appeal to the Connecticut Supreme Court.  (<u>See McClendon I</u>, 45 Conn. App. at 662-66; <u>McClendon III</u>, 248 Conn. at 578-81; Dkt. #41, Exh. P, at 5-6).

[13]<u>See</u> n.12 <u>supra</u>.

13

U.S. 1, 11 (1995)(citations & internal quotations omitted).  This is because the cost of applying the exclusionary rule on collateral review outweighs anything achieved through its application.  See Stone, 428 U.S. at 489-95.  As the U.S. Supreme Court reasoned, employing the exclusionary rule in this context

> would not only exclude reliable evidence and divert attention from the central question of guilt, but would also intrude upon the public interest in (i) the most effective utilization of limited judicial resources, (ii) the necessity of finality in the criminal trials, (iii) the minimization of friction between our federal and state systems of justice, and (iv) the maintenance of the constitutional balance upon which the doctrine of federalism is founded.

Withrow v. Williams, 507 U.S. 680, 687 (1993), citing Stone, 428 U.S. at 491, n.31 (additional citation & internal quotations omitted).

In this case, petitioner claims that the state courts erred in denying his motions to suppress the photographs and tape recordings used to identify petitioner because the affidavit in support of the search warrant did not contain facts from which a finding of probable cause could have been made.  Petitioner argues that the evidence used to assist in his identification was the fruit of an illegal search and seizure, and thus subject to the exclusionary rule.

An application of the exclusionary rule to this case would not alter its outcome.  As respondent accurately posits, even if, assuming arguendo, the search warrant were invalid,[14] petitioner does not and cannot argue that his trial would be different if an identification was made after the procurement of a valid warrant.   See Arizona, 514 U.S. at 11-12.  Further, petitioner was given the full and fair opportunity to litigate his Fourth Amendment claim in the state courts.  (See Dkt. #41, Exh. I).  However, rather than continuing to litigate this issue in his subsequent appeals as a Fourth, Fifth and Sixth Amendment issue as he did in

---

[14]See Section II.A.2. infra.

his Motion to Suppress, dated April 23, 1990 (see id.), petitioner instead brought his claim before the state courts on appeal under the Connecticut Constitution, namely that "the warrant authorizing the line[-]up and voice sample violated article first, § 9 of the Connecticut [C]onstitution,"[15] see McClendon I,  45 Conn. App. at 662; McClendon III, 248 Conn. at 578;[16] in that petitioner never made his federal constitutional claims to the highest state court, respondent argues that petitioner's claim has not been exhausted within the meaning of 28 U.S. C. § 2254(b)(1)(A).[17]

"In general, the exhaustion doctrine provides that a habeas petitioner seeking to upset his state conviction on federal grounds must first have given the state courts a fair opportunity to pass upon his federal claim."  Daye v. Attorney Gen., 696 F.2d 186, 191 (2d Cir. 1982)(multiple citations omitted); see O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999). While petitioner did not have to cite "book and verse on the federal constitution," petitioner "must have placed before the state court essentially the same legal doctrine he asserts in his federal petition."  Daye, 696 F.2d at 192 (multiple citations & internal quotations omitted).

---

[15]Article first, § 9, of Connecticut Constitution provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

[16]As discussed further below, in his Petition for Certification to Appeal, filed September 29, 1997, petitioner argued that the Appellate Court erroneously found that the warrant authorizing the seizure of petitioner for a line-up and voice sample was supported by probable cause, and in doing so, relied on State v. Duntz, 223 Conn. 207, 220-21 (1992) and State v. Shifflett, 199 Conn. 718, 746-47 (1986) to support his claim.  (See Dkt. #41, Exh. P, at 5-6).  Likewise, in his brief to the Connecticut Supreme Court, petitioner again makes his claim under article first, § 9 of the Connecticut Constitution and in a footnote states that in his Motion to Suppress, he relied upon the Fourth, Fifth and Six Amendments and article first, §§ 7 and 8 of the Connecticut Constitution, and on appeal, added article first, § 9 of the Connecticut constitution.  (Dkt. #41, Exh. Q, at 7-12 & n. 7).

[17]28 U.S.C. § 2254(b)(1)(A) reads: "An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that - - the applicant has exhausted the remedies available in the courts of the State . . . ."

The Second Circuit outlined four ways in which a state defendant "may fairly present to the state courts the constitutional nature of his claim . . .": (1) "reliance on pertinent federal cases employing constitutional analysis," (2) "reliance on state cases employing constitutional analysis in like fact situations," (3) "assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution," and (4) "allegation of a pattern of facts that is well within the mainstream of constitutional litigation." Id. at 194.

In this case, in his initial motion to suppress, petitioner moved under article first, §§ 7 and 8 of the Connecticut Constitution and the Fourth, Fifth and Sixth Amendments to the United States Constitution, for an order suppressing as the fruits of an illegal search and seizure any photographs and/or video or audio tapes of his voice, made as a result of the September 15, 1989 line-up, on grounds that the search warrant lacked probable cause, the evidence was the result of an unlawful seizure of his person, and the evidence was obtained without his consent. (Dkt. #41, Exh. I). The Connecticut Superior Court decision denied petitioner's motion on grounds that the affidavit in support of the search warrant established probable cause for requiring him to participate in a line-up. (Id.). In his first direct appeal to the Connecticut Appellate Court and in his appeal to the Connecticut Supreme Court, petitioner argued that "the warrant authorizing the line[-]up and voice sample violates article first, § 9, of the Connecticut [C]onstitution." McClendon I, 45 Conn. App. at 662; McClendon III, 248 Conn. at 578. Petitioner made no reference to the Fourth, Fifth and Six Amendments to the United States Constitution.[18]

_____

[18]In his appeal of his first amended habeas, petitioner petitioned for a writ of habeas predicated on effective assistance of counsel claims. (See Dkt. #41, Exh. D; McClendon IV, 58 Conn. App. at 436). Likewise, petitioner filed a second habeas claiming ineffective assistance of counsel (Dkt. #41, Exh. F; McClendon VI, 2004 WL 1888857, at *1), the denial of which was upheld on appeal. (Dkt. #41, Exh. G; McClendon VII, 93 Conn. App. at 229-32).

Further, in petitioner's Petition for Certification to Appeal, filed September 29, 1997, petitioner argued that the Appellate Court "erroneously found that the warrant authorizing the seizure of the defendant for a [line-up] and voice sample was not supported by probable cause," in support of which contention petitioner relied on State v. Duntz, 223 Conn. 207, 220-21 (1992) and State v. Shifflett, 199 Conn. 718, 746-47 (1986). (Dkt. #41, Exh. P, at 5-6). The proposition in these two cases upon which petitioner relies is the probable cause standard as addressed by the Connecticut Supreme Court. See Duntz, 223 Conn. at 220; Shifflett, 199 Conn. at 745-48. Petitioner did not rely on "pertinent federal cases employing constitutional analysis," nor did he rely on "state cases employing constitutional analysis in like fact situations." Daye, 668 F.2d at 194.[19]

While in his brief to the Connecticut Supreme Court, petitioner again makes his claim under article first, § 9 of the Connecticut Constitution and in a footnote states that in his Motion to Suppress, he relied upon the Fourth, Fifth and Six Amendments and article first, §§ 7 and 8 of the Connecticut Constitution, and on appeal, added article first, § 9 of the Connecticut Constitution, his analysis is based on his Connecticut constitutional claims and he relies exclusively on state court cases. (Dkt. #41, Exh. Q, at 7-12 & n. 7).

In addition to petitioner "fairly present[ing]" to the state courts "the same federal constitutional claim that he now urges upon" this Court, the Second Circuit requires that petitioner must have "utilized all available mechanisms to secure appellate review of the

---

[19]In Shifflett, the issue of probable cause was addressed by the Connecticut Supreme Court in the context of the admissibility of defendant's confession as raised under the Fourth Amendment. 199 Conn. at 745-46. The defendant in that case contended that the search of his apartment was unsupported by probable cause and hence violative of the Fourth Amendment and the photograph seized in that search was "tainted fruit" (id. at 745)(citation omitted), with which contention the Connecticut Supreme Court agreed, but the Court rejected defendant's further argument, like the one posed here, that viewing the unlawfully seized photograph caused him to confess. Id. at 745-50.

denial of that claim." Lloyd v. Walker, 771 F. Supp. 570, 573 (E.D.N.Y. 1991), citing Wilson v. Harris, 595 F.2d 101, 102 (2d Cir. 1979).  In this case, not only did petitioner fail to "fairly present[ ]" his Fourth, Fifth and Six Amendment claims to the state courts, he abandoned such claims in favor of reliance on article first, § 9 of the Connecticut Constitution in his subsequent appeals.  Petitioner's passing reference to the these Amendments to the U.S. Constitution in a footnote in his brief to the Connecticut Supreme Court does not satisfy the requirement that "[t]he ground relied upon must be presented face-up and squarely; the federal question must be plainly defined.  Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick."  Martens v. Shannon, 836 F.2d 715, 717 (1st Cir. 1988).

### 2. STATE COURTS' DETERMINATION OF PROBABLE CAUSE TO ISSUE THE SEARCH WARRANT

As stated above, petitioner moves, pursuant to the Fourth, Fifth and Sixth Amendments to the United States Constitution, for an order suppressing as the fruits of an illegal search and seizure, any photograph, video or audio tape recording of petitioner's person and voice, along with any corporeal identification of petitioner made as a result of the September 15, 1989 line-up, in that the affidavit in support of the search and seizure warrant contained insufficient facts from which to make an independent finding of probable cause, said evidence was the result of an unlawful seizure of petitioner's person, and said evidence was obtained without petitioner's consent.  (Dkt. #29, at 6).  Respondent argues that the state courts' determination that there was sufficient probable cause to issue the search warrant was not contrary to, or an unreasonable application of clearly established federal law.  (Dkt. #41, at 17-20).

In Illinois v. Gates, 462 U.S. 213, 227-41 (1983), the U.S. Supreme Court abandoned

its previous two-pronged rigid test for determining the existence of probable cause, as articulated in <u>Spinelli v. United States</u>, 393 U.S. 410 (1969) and <u>Aguilar v. Texas</u>, 378 U.S. 108 (1964), in favor of a more fluid "totality-of-the-circumstances" test.  As the U.S. Supreme Court recognized, "probable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules."  462 U.S. at 232.  Moreover, a reviewing court should pay "great deference" to a magistrate's determination of probable cause; such determination requires only that the magistrate  has a "substantial basis for . . . concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more."  <u>Id.</u> at 236 (internal quotations, citations, & alterations omitted).  However, wholly conclusory statements will not suffice.  <u>Id.</u> at 239.

In this case, the affidavit of the underlying contested search and seizure warrant included the following information: that the bullets removed from the two shooting victims of the robbery at C & K were identified as .22 caliber "GOLDEN" long rifle bullets by James McDonald, a firearm examiner employed by the Hartford Police Department; on the day of the shooting and robbery, Officer Timothy Shaw interviewed Darlene Hale who relayed that at 4:40 p.m. she observed an American-African man enter C & K by the front door and ask her for an employment application which she gave to him and then he exited by the front door; Hale described this man as being approximately twenty-five years old, 5'6", 150-160 pounds in build with short-cropped hair, a pock-marked face, a moustache, razor burn, gold-rimmed glasses with a brownish-yellow tint, and wearing a light blue dress shirt, unbuttoned and untucked, with the sleeves rolled up, sneakers and possibly a black hat that had a short brim.  (Dkt. #41, Exh. J).  Hale further stated that within a few minutes, she observed the

African-American man who just asked her for the application, standing behind her; the man told her it was a holdup, and he produced a black and silver handgun that he placed to the side of Hale's head. (Id.).   Hale informed him she did not have any money, and  emptied the contents of her purse, including two dollar bills, into a gray plastic bag.  (Id.).  The African-American man then shot  Grayland Cannon and Dennis Shortell, two employees of C & K.  (Id.).  Hale assisted in the preparation of a composite sketch of this man she described.   (Id.).  Hale's description is corroborated by the description given by Cheryl Spillane who was present when an African-American male, armed with a silver and black handgun, robbed Spillane's Service Station on August 7, 1987, four days prior to the C & K robbery. (Id.). Spillane viewed the composite sketch and informed officers that the male in the composite resembled the African-American male who committed the robbery at Spillane's; Spillane also said that this man had a scar on his left cheek. (Id.). Detectives Russo and Kumnick of the Hartford Police Department interviewed Armando Rodriguez who was present at the robbery at Spillane's, and showed him photographs, including one of petitioner, whose description matched the descriptions given by Hale and Spillane. (Id.). Rodriguez made a positive identification of petitioner.  (Id.).  An arrest warrant for petitioner was issued on August 12, 1987, and the next day, petitioner was positively identified in a robbery committed that day at 919 Albany Avenue. (Id.). Petitioner was then arrested and on August 14, 1987, Hale was shown color photographs, including a photograph of petitioner, but she said that she could not identify the suspect without eyeglasses.  (Id.). On June 16, 1989, Hale informed Assistant State's Attorney John Malone that if she heard the voice again, she might be able to identify the speaker as the person who did the shooting.  (Id.).  Thereafter, a line-up viewing and voice sample of petitioner heard by Hale

produced a positive identification. (Id.).

The Connecticut Supreme Court concluded that "the affidavit presented a factual basis to support the court's conclusion that probable cause for the line[-]up and voice sample existed," as the affiants attested that Hale gave a detailed description and assisted in the development of a composite sketch, the composite sketch was used in the positive identification of petitioner in another robbery with the addition of the witness who had added that the suspect had a scar under his left eye, another witness in another robbery confirmed Hale's identification of petitioner by identifying petitioner in a photographic array, and Hale stated that she could identify the robber if he wore eyeglasses and if she heard his voice. McClendon III, 248 Conn. at 580.   Assessing the "totality of circumstances," the Connecticut Supreme Court held that "[i]n light of Hale's composite sketch, which was identified as the defendant by other robbery victims, the issuing judge reasonably could have inferred that probable cause existed to conduct the line[-]up with the defendant participating and a voice recording of the defendant."   Id. at 581; see Gates, 462 U.S. at 232.   Accordingly, in light of the facts presented in the affidavit, the Connecticut Supreme Court's  finding of probable cause for the police to obtain further identifying evidence to assist in the investigation of the robbery and murders, was not contrary to, or an unreasonable application of, the clearly established law as determined in Gates and its progeny.

### 3. RELIABILITY OF THE IDENTIFICATION OF PETITIONER

Petitioner moves to suppress any identification testimony concerning petitioner by Darlene Hale, regarding either pretrial or in-court identification, which the State used at the time of trial, in that the identification procedure was unnecessarily suggestive and irretrievably tainted by the prior illegal identification and thus lacks an independent basis, any

identification offered failed to meet the standard of reliability, and the identification was the product of an illegal custody. (Dkt. #29, at 7).  According to respondent, petitioner's claim fails because the Connecticut courts' determination that the identification procedures were not unnecessarily suggestive neither contravenes nor unreasonably applies clearly established federal law.  (Dkt. #41, at 20-24). __

_____The reliability of Hale's identification is central to petitioner's criminal case as her identification is the linchpin that links petitioner to the robbery and murders at C & K.[20]  In most circumstances, a witness "must testify about an encounter with a total stranger under circumstances of emergency or emotional stress," Manson v. Brathwaite, 432 U.S. 98, 112 (1977), and this case was no different as besides having a gun placed to her head and viewing the shooting of her two co-workers, Hale was seven months pregnant at the time of the robbery. McClendon III, 248 Conn. at 582, 598.  Because of the danger inherent in misidentification, courts must take care to consider all aspects of the identification so as to determine whether such identification constituted a denial of due process. In Neil v. Biggers, 409 U.S. 188, 199-200 (1972), the United States Supreme Court identified "the factors to be considered in evaluating the likelihood of misidentification," namely,

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and confrontation.

Immediately following Neil, the Courts of Appeal developed two approaches to identification evidence.  The first, "or per se approach, . . . focuses on the procedures employed and requires exclusion of the out-of-court identification evidence, without regard to reliability, whenever it has been obtained through unnecessarily suggested confrontation procedures."

---

[20]See n.21 infra.

<u>Manson</u>, 432 U.S. at 110 (footnote omitted). This approach was followed by the Second Circuit. <u>Id.</u> " The second, or more lenient, approach is one that continues to rely on the totality of the circumstances," articulated in <u>Neil</u>. <u>Id.</u> The latter approach has an influence on police behavior as "police will guard against unnecessarily suggestive procedures under the totality rule, as well as the <u>per se</u> one, for fear that their actions will lead to the exclusion of identifications as unreliable." <u>Id.</u> at 112 (footnote omitted). Additionally, the totality of the circumstances test, unlike the <u>per se</u> approach, allows for the admission of identification evidence despite an unnecessarily suggestive procedure, provided the identification is reliable. <u>Id.</u> at 112-13. Accordingly, focusing on the importance of the reliability of the identification, the U.S. Supreme Court has adopted the totality of circumstances test and the factors set out in <u>Neil</u>, which is precisely the test the Connecticut Appellate Court applied in this case. <u>See Manson</u>, 432 U.S. at 114; <u>Neil</u>, 409 U.S. at 199-200; <u>McClendon I</u>, 45 Conn. App. at 662-66.

Petitioner argued before the Connecticut Appellate Court that the line-up was invalid because Hale was shown several photographic arrays containing defendant over the prior two years, and therefore defendant was the only person in the line-up whom Hale had seen before, her identification was unreliable as she was hysterical at the time of the robbery, and her identification did not take place until two years later. <u>McClendon I</u>, 45 Conn. App. at 661-62, 664-66. The Appellate Court concluded that the identification procedure was not unnecessarily suggestive as, although Hale was shown photographs of defendant on several occasions, she did not identify him from those arrays, and because she closely observed him when he requested the employment application and heard him speak several times during the course of the robbery, she needed to see him with eyeglasses and thought that if she

heard his voice, she could identify him as the speaker.  Id. at 665.  Additionally, the Appellate Court concluded that under the totality of circumstances, including Hale's opportunity to see and hear the robber prior to the commencement of the robbery, the fact that she paid a high degree of attention to him and was able to produce a detailed description at the time of the incident, and the fact that Hale demonstrated certainty in identifying him in the line-up, the "trial court properly concluded that the identification procedure was not so suggestive and unreliable as to violate defendant's right to due process."  Id. at 666.

Hale's description, much like the description of the victim in Neil, included the assailant's approximate age, height, weight, complexion, skin texture, and build, and Hale informed investigators that she would be able to identify his voice.   This level of description was characterized by the U.S. Supreme Court as "more than ordinarily thorough." 409 U.S. at 200.  Hale also assisted in a composite of petitioner that was used to positively identify petitioner in another robbery.  Hale's  opportunity to view petitioner at the time of the crime, her degree of attention, and the accuracy of the witness' prior description of petitioner, allow for the assignment of reliability to her identification since Hale's identification stemmed from her recollection of petitioner and not from repeated photographic identification procedures which, while widely used in criminal cases in general and in this case specifically, bear hazards of initial misidentification that cannot be corrected once a witness' memory retains a photographic image rather than an image of the person actually seen.  See Simmons v. United States, 390 U.S. 377, 383-84 (1968). (See Dkt. #41, Exh. S, at 397-99, 403-04).

However, while the lapse of two years from giving the detailed description and identifying the suspect in a line-up far exceeds the lapse of seven months that the Neil court

24

found to be a "seriously negative factor in most cases," like in <u>Neil</u>, 409 U.S. at 201, the testimony is undisputed that despite several photographic arrays in the two year period, most all of which included photographs of petitioner, Hale made no previous identifications and informed investigators that she could not do so without seeing the suspect in eyeglasses, and being aided by the sound of his voice. Her "record for reliability was thus a good one, as she had previously resisted whatever suggestiveness inheres" in the previous photographic showings, of which there were many in the intervening two years. <u>Id.</u> In accordance with U.S. Supreme Court precedent, the Connecticut Appellate Court concluded that weighing all of the factors, there was "no substantial likelihood of misidentification." <u>See</u> <u>Neil</u>, 409 U.S. at 201; <u>see McClendon I</u>, 45 Conn. App. at 665-66. Further, as the U.S. Supreme Court noted in <u>Manson</u>, the evidence of identification was for the jury to decide and this Court is "content to rely upon the good sense and judgment of American juries, for evidence with some element of untrustworthiness is customary grist for the jury mill," and "[j]uries are not so susceptible that they cannot measure intelligently the weight of identification testimony that has some questionable feature." 432 U.S. at 116.[21]

In light of the foregoing, petitioner cannot show that, under the totality of the circumstances, the Connecticut Appellate Court's determination that the procedures were non-suggestive and the identification was reliable, is contrary to, or an unreasonable application of, clearly established law. <u>Williams</u>, 529 U.S. at 397-98.

---

[21]This is particularly true in this case where the jury knew the importance of the reliability of Hale's identification since the palm print on the employment application did not match that of the defendant, and the state's own ballistic expert could not state that the three fatal bullets had been fired from petitioner's gun. <u>McClendon III</u>, 248 Conn. at 611. The jury took its charge seriously and deliberated for about two weeks before reaching a verdict, during which time jurors asked the court to replay both Hale's testimony and the videotape of line-up from which she selected petitioner. <u>Id.</u>

### B. IMPROPER WITHHOLDING OF AN EXCULPATORY POLICE REPORT

Petitioner claims that five days into his criminal trial, on November 25, 1992, the State disclosed a police report authored by Detective Ronald Faggaini that had been withheld by the prosecutor. (Dkt. #43, at 9).[22] According to petitioner, five days later, petitioner filed a Motion for Mistrial claiming that this exculpatory report had been withheld improperly; petitioner claims that this is consistent with his reference on November 19, 1992 to a "Search and Seizure Warrant Faggaini Report," not to the Faggaini police report that the Connecticut Appellate Court concluded was in petitioner's possession on November 19, 1992. (Id. at 9-10).  According to respondent, petitioner's claim regarding wrongful withholding of an exculpatory police report at the time of his probable cause hearing does not implicate federal law as the Constitution does not require that the states provide criminal defendants with probable cause hearings, though  petitioner does have a state-created right to such a hearing.  (Dkt. #41, at 24-26).  Additionally, according to respondent, the Connecticut Appellate Court determined that the report was disclosed to petitioner before his criminal trial.  (Id. at 26).

28 U.S.C. § 2254(a) grants jurisdiction to this Court over an application for a writ of habeas corpus "only on the ground that [the person in custody] is in custody in violation of the Constitution or laws or treaties of the United States."  Thus, in order for this Court to consider petitioner's claim that the "exculpatory" police report was improperly withheld  by the prosecutor at the time of his probable cause hearing, petitioner must have had a right, guaranteed by the Constitution or laws or treaties of the United States, to such hearing,

---

[22]Petitioner contends that the probable cause hearing and most of the pretrial hearing was held "some three years . . . before" the exculpatory police report was disclosed by the State.  (Dkt. #43, at 11).

which right was impaired through the alleged withholding of the report.   Such right does not

exist.  As the U.S. Supreme Court concluded in <u>Gerstein v. Pugh</u>, 420 U.S. 103, 123 (1975),

"[T]he Constitution does not require an adversary determination of probable cause . . . . "

Further,

> Since an adversary hearing is not required, and since the probable cause
> standard for pretrial detention is the same as that for arrest, a person
> arrested pursuant to a warrant issued by a magistrate on a showing of
> probable-cause is not constitutionally entitled to a separate judicial
> determination that there is probable cause to detain him pending trial.

<u>Baker v. McCollan</u>, 443 U.S. 137, 143 (1979)(footnote omitted).  However, the U.S. Supreme

Court, regardless of the lack of a federal right to a probable cause hearing, " recognize[d]

that state systems of criminal procedure vary widely."   <u>Gerstein</u>, 420 U.S. at 123.  In

Connecticut, the state constitution, article first, § 8, as amended, provides in part that "[n]o

person shall be held to answer for any crime, punishable by death or life imprisonment,

unless upon probable cause shown at a hearing in accordance with procedures prescribed

by law. . . ."  <u>See State v. Marra</u>, 222 Conn. 506, 513 (1992)(internal quotations & citations

omitted).[23]  The sentence of imprisonment for a class A felony murder is "a term not less

than twenty-five years nor more than life."  CONN. GEN. STAT. § 53a-35a(2).  Thus, it was

under state law, not federal law, that petitioner was entitled to a probable cause hearing;

this issue is not properly before this Court on a writ of habeas corpus.[24]

---

[23]<u>See also</u> CONN. GEN. STAT. § 54-46a(a):

> No person charged by the state, . . . shall be put to plea or held to trial for
> any crime punishable by death or life imprisonment unless the court at a
> preliminary hearing determines there is probable cause to believe that the offense
> charged has been committed and that the accused person has committed it. . . .

[24]Moreover, in the state courts, petitioner pursued his claim that the withholding of this
report at the probable cause hearing entitled him to a new hearing and trial, in response to which
the Connecticut Appellate Court determined that the report was referred to by defendant during a
November 19, 1992 hearing, after his probable cause hearing but prior to his trial, the statement

<u>C. IMPROPER REFUSAL OF PETITIONER'S REQUEST TO INTRODUCE AN</u>
<u>EXCULPATORY POLICE REPORT UNDER THE RESIDUAL EXCEPTION TO THE</u>
<u>HEARSAY RULE</u>

According to petitioner, after petitioner's motion based on the State's withholding of the Faggaini report was denied, petitioner offered the report as a full exhibit under the residual exception to the hearsay rule; the trial court sustained the State's objection to its admission, and the Connecticut Appellate and Supreme Court rulings upholding the trial court's decision are "[co]ntrary to well established [f]ederal law." (Dkt. #43, at 11-13). Respondent argues that the Connecticut courts reasonably determined that the "exculpatory" police report was not sufficiently reliable to be admitted under the "catch-all" hearsay exception; petitioner did not fairly present a constitutional basis for his hearsay exception claim in the Connecticut courts and therefore it has not been exhausted; and even if petitioner's hearsay exception claim were reviewable, the Connecticut courts' determination was not contrary to, nor an unreasonable application of, clearly established federal law. (Dkt. #41, 27-34). ___

In order to determine whether petitioner's claim is properly before this Court, this Court must consider whether petitioner fairly presented a constitutional basis for his hearsay exception claim to the Connecticut courts, or whether such claim was presented to and

_____

contained in the report was favorable to the defense, and the evidence was "not material because [the Appellate Court was] not persuaded that the outcome of the probable cause hearing would have been different had the Faggaini report been disclosed." <u>McClendon I</u>, 45 Conn. App. at 669. The Appellate Court based its conclusion on the content of the report which included facts consistent with the facts set forth in the affidavit supporting the search and seizure warrant. <u>Id.</u> at 670. According to the Appellate Court, petitioner already had information that would have enabled him to question Hale at the probable cause hearing about the reported conflict between her identification of petitioner in court and her inability to identify him in her statements to the police, and Hale was consistent in her assertion that she has not seen the robber's face during the shootings but recognized the color of his shirt and the way his sleeves were rolled up as the same as the person requesting the application moments before. <u>Id.</u>

analyzed by the Connecticut courts as a purely state evidentiary matter.[25]  In his Connecticut

Appellate Court brief, filed December 22, 1995, petitioner claimed that the Faggaini report

was admissible under the residual exception to the hearsay rule, which allows for the

admission of hearsay if there is "a sufficient probability that the statement is reliable and

trustworthy, if the evidence . . . is necessary to the resolution of the case, and if the trial

court concludes that admitting the statement is in the interests of justice."  (Dkt. #41, Exh.

R, at 28, quoting State v. Stepney, 191 Conn. 233, 249-50 (1983), cert. denied, 465 U.S.

1084 (1984)(additional citations omitted)). In a footnote, petitioner clarified that "to the

extent the constitutional bases of this claim were not fully developed at trial, . . . the rights

to confront witnesses and to present a defense" under the Sixth and Fourteenth

Amendments of the United States Constitution and article first, § 8 of the Connecticut

Constitution, "are fundamental and the record is adequate for review."  (Dkt. #41, Exh. R,

at 28, n.19).  Additionally, petitioner referred to the federal constitutional claim throughout

his argument by reference to Chambers v. Mississippi, 410 U.S. 284 (1973).   (See Dkt. #41,

Exh. R, at 30-31).

     As stated in Section II.A.1. supra, petitioner must exhaust his federal claims in the

state courts before "seeking to upset his state conviction on federal grounds." Daye, 696

F.2d at 191 (multiple citations omitted); see O'Sullivan, 526 U.S. at 842-43.  While petitioner

did not have to cite "book and verse on the federal constitution," petitioner "must have

placed before the state court essentially the same legal doctrine he asserts in his federal

petition."  Daye, 696 F.2d at 192 (multiple citations & internal quotations omitted).  In this

claim, petitioner lays out his federal question much more clearly than he did regarding his

---

[25]See Section II.A.1. supra. Petitioner must exhaust his claim in the state courts before
presenting it to the federal court on an application for writ of habeas corpus.

exclusion claim, as discussed in Section II.A.1. supra.  See Martens, 836 F.2d at 717.

However, while his references to his federal claim could not be called "[o]blique," see id., the

Connecticut Appellate Court, and then subsequently, the Connecticut Supreme Court

addressed petitioner's claim purely as a state evidentiary matter.

The Connecticut Appellate Court began its analysis by addressing its standard of

review regarding challenges to a trial court's evidentiary rulings, and then by citing State v.

Oquendo, 223 Conn. 635, 664 (1992), which recited the definition of the "residual, or catch-

all, exception to the hearsay rule . . . ." McClendon I, 45 Conn. App. at 671. The Appellate

Court found:

> In this case, the defendant claims that the statement met the
> necessity requirement because Faggaini died before the trial and he was the
> sole source of the information contained in his report.  The defendant also
> argues that the statement was reliable and trustworthy because it was an
> official police report filed by the lead investigator.  We find these arguments
> to be meritless.
>
> Although Faggaini indeed could not testify about the contents of his
> report, Hale, the hearsay declarant, was available and testified about her
> statement.  The statements contained in the report were also fairly consistent
> with Hale's testimony at trial and in the search and seizure affidavit.  The
> hearsay statement, therefore, was not reasonably necessary.
>
> The trial court also found that the hearsay was misleading because,
> in the context of the entire report, the statement does not mean what it
> appears to say.  Although Faggaini reported that Hale could not identify the
> gunman, he also reported that Hale recognized the gunman's rolled-up shirt
> sleeve and arm as that of the black male to whom she had given a job
> application minutes before.  These statements are contradictory and render
> the report misleading and unreliable.   We conclude that the trial court
> properly excluded the Faggaini report.

45 Conn. App. at 671-72.

Likewise, the Connecticut Supreme Court concluded:

> The report was Faggaini's summary of his interview with Hale.  Hale
> neither signed nor otherwise adopted the report, and she denied making

some of the statements contained in the report. . . .

The trial court found that the statements concerning Hale's inability to make an identification were misleading in the context of the entire report. We agree. The report was not written in clear and unambiguous terms. Although Faggaini reported that Hale had said she could not identify the gunman since she did not see his face, Faggaini also reported that Hale recognized the gunman's arm as that of the man to whom she had given the job application minutes before the robbery. The court also had before it the search warrant affidavit signed by Faggaini, in which Hale is quoted as saying that she could not identify the robber without seeing him wearing eyeglasses and hearing his voice. In these circumstances, the meaning of the report could not be accurately developed without cross-examining the author.

. . .

The trial court also had heard Hale testify that she did not see the robber's face during the robbery, but that she could identify him from his clothing and voice as a man who earlier had asked her for a job application. She had denied making the statement that she could not identify the robber. The other facts in the report were otherwise generally consistent with Hale's testimony at trial that she identified the earlier job applicant as the robber who had shot the victims.

The statement was not contradicted by the evidence presented at the trial and was not corroborated by any other evidence. The trial court was therefore correct in concluding that the report was not reliable and trustworthy.

McClendon III, 248 Conn. at 583-84 (citations omitted).

The Connecticut Supreme Court then concluded, on purely evidentiary grounds, that

In the present case, the state produced other eyewitnesses who saw the defendant leaving the murder scene wearing the same clothing described by Hale at the time the crimes had been committed, and ballistic evidence that placed the murder weapon at the defendant's apartment. We cannot say, in view of all the circumstances, that the trial court abused its discretion in refusing to admit the police report. We agree with the Second Circuit Court of Appeals that the residual hearsay exceptions should be applied in the rarest of cases, and the denial of admission under the exceptions can only be reversed for an abuse of discretion. Evidentiary rulings will be overturned on appeal only where there was an abuse of discretion and a showing by the defendant of substantial prejudice or injustice. The trial court's judgment was not an abuse of discretion, and the Appellate Court's affirmation was proper.

31

Id. at 584-85 (citations, internal quotations & alterations omitted).

Thus, despite petitioner's presentation to the Connecticut Appellate Court of a state evidentiary matter with reference to a federal claim, neither the Connecticut Appellate Court nor the Connecticut Supreme Court addressed anything beyond petitioner's state evidentiary matter.   As respondent accurately observes, state evidentiary questions are not in the province of a federal habeas court, see Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)("federal habeas corpus relief does not lie for errors of state law[,]")(citations & internal quotations omitted), and the Connecticut courts' failure to construe petitioner's hearsay objection as a claim under the Sixth and Fourteenth Amendments of the Constitution yields the conclusion that petitioner's federal claim was not exhausted in the state courts.

However, even assuming arguendo that petitioner exhausted this claim, the Connecticut courts' determination the Faggaini report was not sufficiently reliable to be admitted under the "catch-all" hearsay exception was not contrary to, nor an unreasonable application of, clearly established federal law. See McClendon I, 45 Conn. App. at 671-72; McClendon III, 248 Conn. at 583-85.  The Confrontation Clause of the Sixth Amendment, made applicable to the States through the Fourteenth Amendment, provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. AMEND. VI.   The Confrontation Clause "operates in two separate ways to restrict the range of admissible hearsay[,]": first, the "Sixth Amendment establishes a rule of necessity," so that the "prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant"; and second, once a witness is shown unavailable, "his statement is admissible only if it bears adequate indicia of reliability." Idaho v. Wright, 497 U.S. 805, 814-15 (1990), quoting Ohio

32

v. Roberts, 448 U.S. 56, 65 (1980)(internal quotations omitted).[26]  As stated above, the

Connecticut Supreme Court employed this test upon certification of the question at issue:

> The residual, or catch-all, exception to the hearsay rule allows a trial court to admit hearsay evidence not admissible under any of the established exceptions if: (1) there is a reasonable necessity for the admission of the statement, and (2) the statement is supported by the equivalent guarantees of reliability and trustworthiness essential to other evidence admitted under the traditional hearsay exceptions.

McClendon III, 248 Conn. at 583 (internal quotations & citations omitted).   The Connecticut

Supreme Court then underwent an analysis of the reliability of the report in light of Faggaini's

unavailability due to his death.   As detailed above, the court found that the report was

unreliable for the following reasons: (a) Hale neither signed nor otherwise adopted the

report, and she denied making some of the statements contained in the report; (b) the

statements concerning Hale's inability to make an identification were misleading in the

context of the entire report;[27] (c)  Hale testified at the trial and her cross-examination was

not impeded (see Dkt. #41, Exh. N, at 61-100), so that the hearsay contained in the report

was not necessary; (d) Hale's statement was not contradicted by the evidence presented at

the trial and was not corroborated by any other evidence; and (e) while the report attributed

some impeaching statements to Hale, the state produced other eyewitnesses who saw

---

[26]In 2004, the U.S. Supreme Court overruled Roberts to the extent that the Court dispensed with the reliability standard in favor of requiring a demonstration of "unavailability and a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 68 (2004). However, the Court's holding in Roberts governs the pending action because a habeas review of state determinations is governed by the Supreme Court's decision "as of the time of the relevant state-court decision." Williams, 529 U.S. at 412.  The Connecticut Supreme Court's determinations were made in 1999, predating the 2004 Crawford decision.

[27]Although Faggaini reported that Hale said she could not identify the gunman since she did not see his face, Faggaini also reported that Hale recognized the gunman's arm as that of the man to whom she had given the job application minutes before the robbery.  Additionally, in the search warrant affidavit signed by Faggaini, Hale is quoted as saying that she could not identify the robber without seeing him wearing eyeglasses and hearing his voice.

petitioner leaving the murder scene wearing the same clothing described by Hale at the time the crimes had been committed, and ballistic evidence that placed the murder weapon at petitioner's apartment.  McClendon III, 248 Conn. at 583-85.  The Connecticut Supreme Court's analysis of reliability and trustworthiness mirrored the Wright/Roberts approach; accordingly, the Connecticut courts' determination was not contrary to, or an unreasonable application of, clearly established federal law.

### D. INEFFECTIVE ASSISTANCE OF COUNSEL[28]

Petitioner contends that after he contacted his counsel, Susan Storey and Fred DeCaprio, following his August 11, 1987 arrest, his counsel sent two investigators to speak with Darlene Hale, and when Hale was shown a picture of a suspect by Detective Omiecinski during the course of the criminal investigation, Hale identified the person as "Charlie McC . . . ," struggling with the suspect's last name.   (Dkt. #43, at 13-14).  The investigators from petitioner's counsel's office offered that they have a client named Charlie McClendon, but Hale responded that she knew McClendon from his previous application to C & K Moving because she worked with his cousin, she knew that  he was not the person who came into C & K on August 11, 1987.  (Id. at 14).  According to petitioner, Detective Omiecinski pressured Hale into identifying petitioner.  (Id. at 14-15).  Further, petitioner contends that his counsel were ineffective in failing to call their investigators who knew that Hale would not identify petitioner because of her past involvement with him and her working relationship with his cousin. (Id. at 15-16).[29]

---

[28]"[I]ssues of law for § 2254(d) purposes . . . [include] . . . the effectiveness of counsel's assistance."  Thompson, 516 U.S. at 111, citing Strickland v. Washington, 466 U.S. 668, 698 (1984); see Lupien, 403 F.3d at 620 (§ 2254(e)(1) was formerly codified as § 2254(d)).

[29]In his reply brief, petitioner also claims, for the first time, that his counsel did not follow petitioner's request to call and investigate Charlie Oueiroge who said that although he had seen

On December 8, 1987, Ellen Knight and Irma Grimes, inspectors employed by the public defender's office, interviewed Hale, who said that one of the police officers "has tried to make her feel that it is because of her that [the police] have [not] solved the case," and the police told Hale that they really want to make an arrest on this one but that Hale told them that "before she sends someone to the electric chair on her testimony[,] she has to be 100% certain." (Dkt. #41, Exh. M, ¶¶ 73-78).  Further, Hale told the investigators that the police told her the robber's name was "Charles McClellar," in response to which the investigators clarified that their client is named "Charles McClendon."  (Id. ¶¶ 81-82).  Hale told them that she was shown a picture of Charles McClendon and "he was not the guy." (Id. ¶ 83).  She said she knew this because his cousin, James Dennis, worked at C & K and McClendon put his name down as a reference on an application he completed in June 1986; he came in about four times to check on his application so she would know what he looks like.  (Id. ¶¶  85, 93, 97, 100).  Conversely, during petitioner's trial, almost two years later, Hale testified that when she witnessed a line-up with the individuals wearing sunglasses, she identified petitioner, to whom she pointed in the courtroom.  (Dkt. #41, Exh. N, at 58-59). Additionally, Hale testified that she had "no doubt" that the voice of the person who asked for the employment application was the same as the person who later shot her co-workers, and that she had "no doubt" that he was the person she identified in court.  (Dkt. #41, Exh. N, at 59).

Hale also testified at trial that she recalled that Detective Faggaini mentioned the name "Charles McCullen" (Dkt. #41, Exh. N, at 70; see id. at 79), and Hale knew a Charles

---

petitioner before in the vicinity of C & K, he was not the person he saw on August 11, 1987; and petitioner's witness Minnie Thompson "had to protest outside of the [courthouse]" in order to be called as a witness by counsel.  (Id. at 16).

McCullen who had completed a job application at C & K in the past. (Dkt. #41, Exh. N, at 79). Contrary to Hale's statement to the investigators, Hale testified that she did not know if Charles McCullen was related to James Dennis. (Id. at 80). Further, Hale testified that she did not recall telling the investigators that she knew Charles McClendon because he filled out an application for C & K. (Id. at 81). Hale clarified that her statements to the investigators about Charles McClendon, related to Charles McCullen, and she did not know that McCullen was related to James Dennis but that she had recently been told that McClendon is related to James Dennis. (Id. at 81-85). At the core of petitioner's ineffective assistance of counsel claim is that his counsel failed to use Hale's statements to the investigators to impeach her at trial.

In order to establish a claim of ineffective assistance of counsel, petitioner must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment," and the court must determine "whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland v. Washington, 466 U.S. 668, 690 (1984). "Judicial scrutiny of counsel's performance must be highly deferential," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." Id. at 689-90. Moreover, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable . . . ." Id. at 690.

Attorneys DeCaprio and Storey testified at petitioner's state habeas trial about their tactical and strategic choices made throughout petitioner's underlying trial, and specifically about the decision not to use Hale's statements to the investigators as impeachment

evidence. (Dkt. #41, Exh. O).  Attorney DeCaprio testified that while petitioner felt that his

counsel should portray Hale as a liar, counsel did not feel that calling the investigators as

witnesses would be "very effective in light of the way the cross-examination went at the

trial[,] [a]nd [in light of] the probable cause hearing testimony." (Dkt. #41, Exh. O, at 6-7).

Counsel had an interview conducted of petitioner's relative who worked at C & K, and they

"sought to try to pursue every avenue [they] could as to why Darlene Hale might of lied."

 (Dkt. #41, Exh. O, at 8-9).  Specifically, counsel looked at her divorce case and considered

whether:

> there was some reason that she would be involved in this robbery herself and
> perhaps be covering up for someone?  Was the person she was covering up
> [for] possibly even her husband? Did the police put pressure on her?  Did
> they have some leverage over her to make her say things she did? We had
> no formal basis for believing any of those things, but certainly they were
> considered because we wanted to consider every possibility.

(Dkt. #41, Exh. O, at 9).    Attorney DeCaprio concluded that counsel's trial strategy

"[t]actically . . . was not a mistake, it was the right way to go."  (Id. at 8).

Likewise, Attorney Storey testified that they developed several strategies including

that Hale was lying about her identification of petitioner, or that she had been pressured to

identify, or was mistaken in identifying petitioner.  (Id. at 15-16).   Attorney Storey testified

that:

> We investigated by looking in her divorce file, by . . . trying to find
> some reason that the police could put pressure on her to lie about the
> identification.  Investigating her husband, trying to find out why she left the
> [S]tate.  We knew she had been pregnant at the time of the shooting, so we
> were wondering if DCF had put any pressure to take her children for any
> reason.  There were several possibilities we tried to follow up.  We could not
> find any conclusive evidence of that, of her lying.
> . . .
>
> We investigated some other people that we thought were possibilities
> for having committed the murders . . . . [W]e followed up on avenues to

show that [Hale] was mistaken.

(Dkt. #41, Exh. O, at 16-17).   According to Attorney Storey, pursuing a strategy that they were calling Hale a liar rather than showing she was mistaken was "not the tact to take with this jury or with the way the case was going." (Id. at 17).  Further, Attorney Story explained that after consideration, counsel decided it would not benefit the defense if they called as witnesses the inspectors and petitioner's cousin, James Dennis.  (Id. at 17-23).

Counsel's decision not to impeach Hale with the statement she had given to the investigators was a tactical decision that counsel, as Attorney Storey testified, spent a lot of time considering.  Relying on the U.S. Supreme Court's directive set forth in Strickland, the Connecticut courts did not disturb counsel's strategic decision, finding that their exercise of professional judgment was reasonable and resulted from a thorough investigation.  See McClendon VII, 93 Conn. App. at 229-32; see Strickland, 466 U.S. at 690.  Accordingly,  the state courts' determination was not contrary to, or an unreasonable application of, federal law as set forth in Strickland.

        E. HABEAS COURT'S DETERMINATION THAT PETITIONER RECEIVED EFFECTIVE
        ASSISTANCE AND ITS REFUSAL TO ALLOW PETITIONER TO APPEAL ITS DISMISSAL
        OF HIS WRIT OF HABEAS CORPUS

        According to petitioner, the habeas and Appellate Court's decisions that petitioner received effective assistance of counsel and their refusal to allow petitioner to appeal the dismissal of his habeas action was "unreasonable and contrary to [f]ederal [e]stablished [l]aw." (Dkt. #43, at 17).  As respondent contends, petitioner's claim that the state habeas court abused its discretion is a matter of state law and is not cognizable in a federal habeas action.  (Dkt. #41, at 38-39).  See Bellino v. Armstrong, No. 3:03 CV 1346 (DJS), 2007 WL 283090, at *10 (D. Conn. Jan. 30, 2007)(same proposition).

<u>III. CONCLUSION</u>

For the reasons stated above, petitioner's Amended Petition for Writ of Habeas Corpus (Dkt. #29) is <u>denied</u>.

<u>See</u> 28 U.S.C. § 636(b)**(written objections to ruling must be filed within ten days after service of same);** Fed. R. Civ. P. 6(a), 6(e) & 72; Rule 72.2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; <u>Small v. Secretary, H&HS</u>, 892 F.2d. 15, 16 (2d Cir. 1989)**(failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).**

Dated at New Haven, Connecticut, this 14th day of February, 2008.

_/s/_____
Joan Glazer Margolis
United States Magistrate Judge